19 F.3d 393
 Kalima JENKINS, by her next friend Kamau AGYEI; Carolyn
Dawson, by her next friend Richard Dawson; Tufanza A. Byrd,
by her next friend, Teresa Byrd; Derek A. Dydell, by his
next friend Maurice Dydell; Terrance Cason, by his next
friend, Antoria Cason; Jonathan Wiggins, by his next
friend, Rosemary Jacobs Love; Kirk Allan Ward, by his next
friend, Mary Ward; Robert M. Hall, by his next friend,
Denise Hall; Dwayne A. Turrentine, by his next friend,
Sheila Turrentine; Gregory A. Pugh, by his next friend,
David Winters, on behalf of themselves and all others
similarly situated, Plaintiffs-Appellees,
American Federation of Teachers, Local 691, Plaintiffs,
v.
STATE OF MISSOURI; John Ashcroft, Governor of the State of
Missouri; Wendell Bailey, Treasurer of the State of
Missouri; Missouri State Board of Education; Roseann
Bentley; Dan L. Blackwell; Gary D. Cunningham; Raymond
McCallister, Jr.; Susan D. Finke; Thomas R. Davis;
Cynthia B. Thompson, Members of the Missouri State Board of
Education; Robert E. Bartman, Commissioner of Education of
the State of Missouri, Defendants-Appellants,
School District of Kansas City, Missouri; Claude C.
Perkins, Superintendent thereof, Defendants-Appellees.
Kalima JENKINS, by her next friend, Kamau AGYEI; Carolyn
Dawson, by her next friend Richard Dawson; Tufanza A. Byrd,
by her next friend Teresa Byrd; Derek A. Dydell, by his
next friend Maurice Dydell; Terrance Cason, by his next
friend Antoria Cason; Jonathan Wiggins, by his next
friend Rosemary Jacobs Love; Kirk Allan Ward, by his next
friend Mary Ward; Robert M. Hall, by his next friend Denise
Hall; Dwayne A. Turrentine, by his next friend Sheila
Turrentine; Gregory A. Pugh, by his next friend David
Winters; on behalf of themselves and all others similarly
situated, Plaintiffs-Appellees,
American Federation of Teachers, Local 691, Intervenor-Appellee,
v.
STATE OF MISSOURI; John Ashcroft, Governor of the State of
Missouri; Wendell Bailey, Treasurer of the State of
Missouri; Missouri State Board of Education; Roseann
Bentley, Member of the Missouri State Board of Education;
Raymond McCallister, Jr., Member of the Missouri State Board
of Education; Susan D. Finke, Member of the Missouri State
Board of Education; Thomas R. Davis, presiding President,
Member of the Missouri State Board of Education; Robert E.
Bartman, Commissioner of Education of the State of Missouri;
Gary D. Cunningham, Member of the Missouri State Board of
Education; Rebecca M. Cook, Member of the Missouri State
Board of Education; Sharon M. Williams, Member of the
Missouri State Board of Education; Jacquelline Wellington,
Member of the Missouri State Board of Education, Defendants-Appellants,
School District of Kansas City, Missouri; Walter L. Marks,
Superintendent thereof, Defendants-Appellees.
Kalima JENKINS, by her next friend, Kamau AGYEI; Carolyn
Dawson, by her next friend Richard Dawson; Tufanza A. Byrd,
by her next friend Teresa Byrd; Derek A. Dydell, by his
next friend Maurice Dydell; Terrance Cason, by his next
friend Antoria Cason; Jonathan Wiggins, by his next friend
Rosemary Jacobs Love; Kirk Allan Ward, by his next friend
Mary Ward; Robert M. Hall, by his next friend Denise Hall;
Dwayne A. Turrentine, by his next friend Sheila Turrentine;
Gregory A. Pugh, by his next friend David Winters; on
behalf of themselves and all others similarly situated,
Plaintiffs-Appellees,
American Federation of Teachers, Local 691, Intervenor-Appellee,
v.
STATE OF MISSOURI; John Ashcroft, Governor of the State of
Missouri; Wendell Bailey, Treasurer of the State of
Missouri; Missouri State Board of Education; Peter
Herschend, Member of the Missouri State Board of Education;
Raymond McCallister, Jr., Reverend, Member of the Missouri
State Board of Education; Susan D. Finke, Vice-President,
Member of the Missouri State Board of Education; Thomas R.
Davis, Member of the Missouri State Board of Education;
Robert E. Bartman, Commissioner of Education of the State of
Missouri; Gary D. Cunningham, President, Member of the
Missouri State Board of Education; Rebecca M. Cook, Member
of the Missouri State Board of Education; Sharon M.
Williams, Member of the Missouri State Board of Education;
Jacquelline Wellington, Member of the Missouri State Board
of Education, Defendants-Appellants,
School District of Kansas City; Walter L. Marks,
Superintendent thereof, Defendants-Appellees.
Kalima JENKINS, by her next friend Kamau AGYEI; Carolyn
Dawson, by her next friend Richard Dawson; Tufanza A. Byrd,
by her next friend, Teresa Byrd; Derek A. Dydell, by his
next friend Maurice Dydell; Terrance Cason, by his next
friend, Antoria Cason; Jonathan Wiggins, by his next
friend, Rosemary Jacobs Love; Kirk Allan Ward, by his next
friend, Mary Ward; Robert M. Hall, by his next friend,
Denise Hall; Dwayne A. Turrentine, by his next friend,
Sheila Turrentine; Gregory A. Pugh, by his next friend,
David Winters, on behalf of themselves and all others
similarly situated, Plaintiffs-Appellees,
American Federation of Teachers, Local 691, Intervenor-Appellee,
v.
STATE OF MISSOURI; Mel Carnahan, Governor of the State of
Missouri; Bob Holden, Treasurer of the State of Missouri;
Missouri State Board of Education; Peter Herschend, Member
of the Missouri State Board of Education; Raymond
McCallister, Jr., Reverend, Member of the Missouri State
Board of Education; Susan D. Finke, Vice-President, Member
of the Missouri State Board of Education; Thomas R. Davis,
Member of the Missouri State Board of Education; Robert E.
Bartman, Commissioner of Education of the State of Missouri;
Gary D. Cunningham, President, Member of the Missouri State
Board of Education; Rebecca M. Cook, Member of the Missouri
State Board of Education; Sharon M. Williams, Member of the
Missouri State Board of Education; Jacquelline Wellington,
Member of the Missouri State Board of Education, Defendants-Appellants,
School District of Kansas City; Walter L. Marks,
Superintendent thereof, Defendants-Appellees.
 Nos. 90-2238, 91-3636, 92-3194, 92-3200 and 93-3274.
 United States Court of Appeals,
Eighth Circuit.
 March 15, 1994.
 
 Appeal from the United States District Court for the Western District of Missouri, Russell G. Clark, Judge.
 Before RICHARD S. ARNOLD, Chief Judge, McMILLIAN, Circuit Judge, JOHN R. GIBSON,* Senior Circuit Judge, FAGG, BOWMAN, WOLLMAN, MAGILL, BEAM, LOKEN, HANSEN, and MORRIS SHEPPARD ARNOLD, Circuit Judges.
 ORDER
 The suggestion for rehearing en banc is denied. Judges Bowman, Wollman, Beam, Loken, and Morris Sheppard Arnold would grant the suggestion.
 JOHN R. GIBSON, Senior Circuit Judge, concurring in the denial of rehearing en banc, joined by McMILLIAN and MAGILL, Circuit Judges.
 
 
 1
 The dissent to the denial for rehearing en banc would now rehear the ninth decision of this court, 11 F.3d 755, dealing with the intradistrict remedy for the constitutional violations in the Kansas City, Missouri School District. Its willingness to do so is based on a misperception of the issues in this case and a highly selective reading of the record before the district court.
 
 
 2
 The dissent accepts, at least in part, the State's argument that the district court adopted a student achievement goal, measured by test scores, as the only basis for determining whether past discrimination has been remedied. The dissent develops this argument at length by examining the testimony of several witnesses. Certainly, Dr. Marks and Dr. Rainwater referred to student achievement test results, but their testimony covered a far broader spectrum. When we deal with student achievement in a quality education program in the context of relieving a school district of court supervision, test results must be considered. Test scores, however, must be only one factor in the equation. Nothing in this court's opinion, the district court's opinion, or the testimony of KCMSD's witnesses indicates that test results were the only criteria used in denying the State's claim that its obligation for the quality education programs should be ended by a declaration they are unitary.
 
 
 3
 The Kansas City school desegregation litigation does not deal with "pedagogical sociology," see dissent, Op. at 400, but rather the remedy for the constitutional violations and injuries, uncontested if not admitted, that we summarized in Jenkins v. Missouri, 949 F.2d 1052, 1057 (8th Cir.1991) (Jenkins VII ):
 
 
 4
 The ultimate issue in this case, as it has been over the years, is remedying serious and pervasive constitutional violations. [Jenkins v. Missouri ] Jenkins II, 855 F.2d [1295] at 1300 (quoting Jenkins v. Missouri, 593 F.Supp. 1485, 1492 (W.D.Mo.1984) ("the inferior education indigenous of the state-compelled dual school system has lingering effects in the Kansas City, Missouri School District") and Jenkins v. Missouri, 639 F.Supp. 19, 24 (W.D.Mo.1985) ("Segregation has caused a system wide reduction in student achievement in the schools of the KCMSD")....)
 
 
 5
 Few of the school desegregation cases have attempted to remedy as difficult an injury as "a system wide reduction in student achievement" caused by discrimination against black students. A quality of education program was part of the desegregation plan in DeKalb County, Georgia, which was before the Supreme Court in Freeman v. Pitts, --- U.S. ----, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992). Justice Kennedy there referred to the "more ineffable category of quality of education." Id. --- U.S. at ----, 112 S.Ct. at 1441. The district court's treatment of comparative test results in Freeman and its holding that the district had not achieved unitary status with respect to quality of education programs was noted by the Supreme Court, id. --- U.S. at ---- - --, 112 S.Ct. at 1441-42, and the parties did not challenge this part of the order. Id. --- U.S. at ----, 112 S.Ct. at 1446. Thus, the Milliken II[1] quality education components of the district court's decree remain in effect.
 
 
 6
 While the dissent argues that no particular level of education is guaranteed by the Constitution, the Constitution does require, as articulated again in Freeman, that the vestiges of discrimination be eliminated to the extent practicable. See 112 S.Ct. at 1448. Applying this test to the system wide reduction in student achievement, of a widespread and long-standing nature, is the task to which the district court addressed itself.
 
 
 7
 The dissent demolishes a strawman of a one-hundred year remedy. These words were those of the State's lawyer in a leading question, with which Dr. Rainwater agreed. The district court nowhere mentions this exchange. To the contrary, as the panel recognized, the district court called for submission of alternative plans phasing out court-ordered funding in three, five, seven or ten years. The dissent raises numerous other issues that should be answered, but reference to the panel's opinion is sufficient for this purpose.
 
 
 8
 We have in our earlier decisions observed that "[t]he choice of remedies to redress racial discrimination is 'a balancing process left, within appropriate constitutional or statutory limits, to the sound discretion of the trial court.' " Jenkins v. Missouri (Jenkins II ), 855 F.2d 1295, 1299 (8th Cir.1988) (quoting United States v. Paradise, 480 U.S. 149, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987)), aff'd in part and rev'd in part, 495 U.S. 33, 110 S.Ct. 1651, 109 L.Ed.2d 31 (1990). The significance of the district court's analysis is underscored by Freeman, --- U.S. at ----, 112 S.Ct. at 1445-46, which discussed the district court's discretion to order an incremental withdrawal.
 
 
 9
 The reasons advanced by the dissent do not justify rehearing en banc.
 
 
 10
 BEAM, Circuit Judge, dissenting from the denial of rehearing en banc, joined by BOWMAN, WOLLMAN, LOKEN, and MORRIS SHEPPARD ARNOLD, Circuit Judges.
 
 
 11
 The court, with a vote of six nays and five yeas, denies en banc consideration of orders of the district court dealing, in part, with court ordered pay raises for employees of the Kansas City, Missouri School District (KCMSD) and with the partial unitary status of the school district. I dissent.I.
 
 
 12
 The de jure racial segregation of the KCMSD has been before the same United States District Judge for the Western District of Missouri since 1977. In that year, "the KCMSD implemented a desegregation plan," which reassigned African-American (minority) and European-American (majority) students within the district and which was designed to effect "a minimum of 30% minority enrollment ... in every KCMSD school." Jenkins v. Missouri, 639 F.Supp. 19, 35 (W.D.Mo.1985). Minority students from schools with a large minority enrollment were moved to schools with a large majority enrollment and vice versa. School boundary lines were changed, attendance zones created and more than 16,000 KCMSD students had their school assignments changed. Id. at 35-36. In 1979-1980, the United States Office of Civil Rights classified the KCMSD as being "in compliance" with federal requirements of school desegregation under Title VI of the Civil Rights Act of 1964. Id. at 36.
 
 
 13
 Between 1977 and 1985 the KCMSD majority enrollment decreased by more than forty-four percent while minority enrollment decreased by only thirty percent. Id. By 1985, nineteen of the fifty elementary schools in the KCMSD had enrollments of ninety percent or more minority students. Id. Tax collections were on the decline and school financing plans were failing at the ballot box. "White flight" to private schools and to the suburbs was rampant.
 
 
 14
 The district court, correctly recognizing that at least part of this problem was the consequence of the de jure segregation previously practiced under Missouri constitutional and statutory law, fashioned a remedial plan for the desegregation of the KCMSD and for "the elimination of all vestiges of state imposed segregation." Id. at 23. This laudable goal was in accordance with the requirements of Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). "The transition to a unitary, nonracial system of public education was and is the ultimate end to be brought about." Id. at 436, 88 S.Ct. at 1693. School boards were charged in Green with taking all necessary steps to convert to unitary systems in which racial discrimination would be eliminated "root and branch." Id. at 438, 88 S.Ct. at 1694.
 
 
 15
 Although the district court deemed the KCMSD and the state liable for the results of past racial discrimination, the court found that the suburban school districts (SSDs) surrounding Kansas City were not guilty of constitutional wrongs requiring them to participate in a court imposed remedy. This holding was affirmed by this court, en banc, in Jenkins v. Missouri, 807 F.2d 657 (8th Cir.1986) (Jenkins I ), cert. denied, 484 U.S. 816, 108 S.Ct. 70, 98 L.Ed.2d 34 (1987). The nonliability of the SSDs presented at least one obvious remedial problem; specifically, the minority students in the KCMSD could not be intermixed by court order with the majority students in the suburbs. With this restriction in mind, the district court fashioned an aggressive and far reaching remedial plan binding only on the KCMSD. Some observers have described it as the most ambitious and expensive remedial program in the history of school desegregation.
 
 
 16
 The district court concluded that segregation had caused, among other things, "a systemwide reduction in student achievement." Jenkins, 639 F.Supp. at 24 (emphasis in original). This reduction in achievement, together with the deterioration in physical facilities, health concerns, safety concerns, comfort concerns and inadequate funding of all educational activities, had, at least in part, caused the "white flight" noted earlier. Thus, the district court imposed a remedy broadly designed (1) to attract majority students to KCMSD schools in order to provide minority students with a multiracial educational experience and (2) to provide a high-quality educational program, whether or not a significantly desegregated school population was ever achieved.
 
 
 17
 A general outline of the remedy, affirmed with some modifications by this court, is as follows:[2](1) A court imposed taxation plan on the citizens of Kansas City, Missouri, for school purposes.
 
 
 18
 (2) Joint and several liability between the state and the KCMSD that required the state to provide substantial remedial funds including fund shares otherwise imposed upon the KCMSD for which no local monies were immediately available.
 
 
 19
 (3) A system of magnet schools with educational themes designed to attract majority students away from the suburbs and the private schools to which they had fled and to expand the educational opportunities for all students.
 
 
 20
 (4) An educational program aimed at "results more in keeping with national norms," Jenkins, 639 F.Supp. at 24, with reading skills at such national norms to be achieved within four or five years. Id. The educational program was to include:
 
 
 21
 (a) An annual evaluation rating of AAA, the highest classification awarded by the Missouri State Department of Elementary and Secondary Education, for all KCMSD schools. (All SSDs were and presently are AAA rated. At the time of the remedial order, the KCMSD was rated AA).
 
 
 22
 (b) Reduction of class sizes to levels below those required for the AAA rating.
 
 
 23
 (c) Extensive library improvements through improved media and library resources and through the hiring of at least twenty-two new librarians, thirteen of whom are certified for elementary schools.
 
 
 24
 (d) A system-wide computer education program with state-of-the-art automation equipment and highly skilled instructors.
 
 
 25
 (e) A reduced teaching load for all teachers and an improved curriculum with "additional art, physical education and music programs with specialty teachers.
 
 
 26
 (f) Additional school counselors to begin service at the elementary level and to reduce the workload of existing counselors at the secondary level to one full time counselor for each 390 students or fraction thereof.
 
 
 27
 (g) A summer school program providing remedial and developmental learning experiences, reinforcement and enrichment instruction and a "desegregative learning experience." Id. at 31.
 
 
 28
 (h) A full day kindergarten program in all elementary schools in the district.
 
 
 29
 (i) An extended day program including before and after school tutoring.
 
 
 30
 (j) An extensive early childhood development program.
 
 
 31
 (5) An "effective schools" program designed to accomplish changes in the KCMSD from the "bottom up." This program involves money for special programs developed by staff, parents, patrons, administrators, principals, teachers and students. Id. at 33.
 
 
 32
 (6) Staff development through special training in the principles and goals of the desegregation plan, implementation of effective instructional programs, effective information transmission, imposition of equitable discipline, solving transportation problems, use of school and community resources, and the law applicable to school desegregation.
 
 
 33
 (7) A mandatory student reassignment study costing not over $175,000.
 
 
 34
 (8) A voluntary interdistrict (KCMSD and SSD) transfer program.
 
 
 35
 (9) District-wide capital improvements.
 
 
 36
 (10) A separate desegregation plan administration.
 
 
 37
 (11) A desegregation monitoring committee.
 
 
 38
 (12) A new salary schedule designed to enhance the pay of all teachers and administrators and to aid in the recruitment and retention of staff at all levels and areas of responsibility.
 
 
 39
 The plan, very broadly outlined above, was implemented for the 1985-1986 school year. It has been ongoing and evolving since that time.
 
 
 40
 For the eight school years under the remedy, 1985-1986 through 1992-1993, the total KCMSD/state expenditures for the desegregation plan alone has been in excess of $902,473,047 and is escalating.[3] The KCMSD also apparently spends approximately two additional local, state or federal dollars on its school system beyond each dollar spent for the desegregation plan.[4] The annual per capita costs of the KCMSD far exceed those of the SSDs. I have compared the per-pupil cost for the year 1991-1992 (the only year readily available to me) for the KCMSD and for each SSD. With capital costs included, the per-pupil costs in the SSDs ranged from a low of $4,192 to a high of $7,488. KCMSD costs per pupil, by comparison, were $13,500. The SSDs operating costs (excluding capital costs) fell between $2,854 and $5,956 per student. The KCMSD spent $9,412 per student. With this for background, I turn to the present dispute.
 
 II.
 
 41
 The state now seeks en banc consideration of parts of four orders of the district court and objects, specifically, to two facets of the district court rulings: (1) an order of June 30, 1993, granting additional salary increases to all employees of the KCMSD and (2) the district court's denial of partial unitary status of the KCMSD through the order of June 17, 1992.
 
 A.
 
 42
 The state contends, and I agree, that federal court orders in school desegregation cases must directly address the constitutional violation. Milliken v. Bradley, 433 U.S. 267, 281-82, 97 S.Ct. 2749, 2757-58, 53 L.Ed.2d 745 (1977) (Milliken II ). An examination of the record supports the state's contention that further blanket wage increases will not directly enhance the educational program of the KCMSD. It should be noted that since 1985-1986, the court plan has required a competitive, if not generous, pay scale in the KCMSD. Thus, in my view, the current effort by the KCMSD and the American Federation of Teachers (AFT), aided by the plaintiffs, to bypass the collective bargaining process is uncalled for and is probably not an exercise reasonably related to the constitutional violations found by the court in 1985. Further, it enables the KCMSD to involve the state, via the joint and several liability holdings of the court, in pay raises the KCMSD probably could not impose upon its constituents. The court's salary order also enables the teachers' union to achieve goals that would be unattainable under the bargaining process.
 
 
 43
 Even so, I am willing to give the district court, and the panel, the benefit of the doubt with regard to wage increases for teaching and direct educational support personnel. The salary order affirmed by the panel, however, goes well beyond pay increases for these groups of KCMSD employees. I agree with the state that logic does not directly relate the pay of parking lot attendants, trash haulers and food handlers, for instance, to any facet or phase of the desegregation plan or to the constitutional violations. In my view, the panel was wrong in affirming this portion of the salary order.B.
 
 
 44
 In early 1992, the KCMSD presented to the district court its proposed budget for year VIII of the desegregation plan. The state, in response, lodged numerous budgetary objections and contended that, under the holding in Freeman v. Pitts, --- U.S. ----, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992), the KCMSD had achieved partial unitary status in the "high-quality educational program" (the Milliken II programs) prong of the remedial order. The district court conducted an evidentiary hearing on both the state's budget complaints and its partial unitary status contention on May 27-28, 1992. On June 17, 1992, the district court entered an order approving a year VIII budget and directing the KCMSD to submit a "Long Range Magnet Plan." Order of June 17, 1992. The court made no findings on the unitary status of the KCMSD and the state appealed the court's failure to address the issue.
 
 
 45
 Whether the KCMSD has actually achieved partial unitary status in the quality of its educational program imposed by the desegregation plan is, perhaps, still an open question on the record before us today. Even so, the standard adopted by the district court and by the panel to evaluate this question misreads Freeman and creates a hurdle to the withdrawal of judicial intervention from public education that has no support in the law. The district court has, with the approbation of the panel, imbedded a student achievement goal measured by annual standardized tests into its test of whether the KCMSD has built a high-quality educational system sufficient to remedy past discrimination. The Constitution requires no such standard.
 
 
 46
 Although the district court has not yet visited the unitary status question with the diligence it deserves, three orders subsequent to the June 17, 1992, order enlightened the panel regarding the court's analysis. First, on April 16, 1993, after additional hearings and ten months after the contested order, the court approved, in part, additional funding for magnet schools and directed the KCMSD to submit further financing proposals. As part of this order, the court found that while the educational opportunities afforded in the magnet schools are better than those previously available and the magnet school plan has successfully gained the interest of a substantial pool of majority students in attending KCMSD schools, the KCMSD cannot be declared partially unitary because academic achievement is still at or below national norms for many grade levels. Order of April 16, 1993, at 9-13. Second, on June 30, 1993, after a hearing held on June 1-3, 1993, the district court entered the contested salary order. Finally, insofar as the petition for rehearing is concerned, the court entered an order on July 30, 1993, which states in part: "[t]he Court finds that it would be wholly inappropriate to deem the KCMSD unitary or partially unitary at this time." Order of July 30, 1993, at 4. A July 7, 1993, hearing predated this order.
 
 
 47
 In affirming the district court's June 17, 1992, implied denial of partial unitary status, the panel refers to evidence received at the May 1992 hearing as well as to a statement on the goal of the desegregation remedy made by the district court during that hearing. In this regard, the district court said: " '[t]he [c]ourt's goal was to integrate the Kansas City, Missouri, School District ... and all these [Milliken II ] matters were elements to be used to try to integrate the [KCMSD].... That's the goal. And a high standard of quality education.' " Jenkins v. Missouri, 11 F.3d 755, 761 (8th Cir.1993) (quoting the district court).
 
 
 48
 My examination of the record reveals no evidence directly relevant to the issue of unitary status other than that adduced at the May 1992 hearing. The panel, however, in responding to the state's contention that the district court erred, as a matter of law, in failing to rule on the Freeman issue in the June 17, 1992, order, relies on conclusory and fact finding portions of the April 16, 1993, order and, of course, on the district court's specific ruling on July 30, 1993. The meager record on appeal that the panel was forced to assemble from these disjointed parts only complicated the panel's attempt to engage in its own Freeman analysis.
 
 
 49
 When the district court referred to academic achievement "below national norms" in its April 16, 1993, order, the information came directly from the May 27, 1992, testimony of Arthur Rainwater, Associate Superintendent for Instruction of the KCMSD, given during the hearing on the Year VIII budget plan and the state's request for partial unitary status. The data before the court showed that at the beginning of the seventh year of the remedy, comparing similar tests administered at each grade level K through 12, in the same month of the year in 1985 and 1991, individual student achievement in the KCMSD remained below the "national norm," at grades 4 and up, except in one subject in one grade. Joint Appendix A, Vol. VII at 1495. Achievement also remained under the national norm in some subjects in the earlier grades. Id.
 
 
 50
 So, indeed, the district court was justified in finding that academic improvement in the seven years since the program began had been less than dramatic. It is this April 16 finding of fact that the panel appears to find sufficient to affirm the denial of partial unitary status. But, student achievement does not set the constitutional standard for determining partial unitary status.
 
 
 51
 The appellees, in their response to the state's petition for rehearing, contend that the panel did not rely on a student achievement standard in affirming the district court. The words "achievement test results" or even "test results," so say the appellees, "are nowhere to be found in the panel decision." Response at 7. This argument, in my view, is disingenuous. The panel affirmed the district court. The district court obviously relied upon test scores below the national norm as the basis for its ruling. The district court, by its own statement, "[h]as gone to great lengths to provide the KCMSD with facilities and opportunities not available anywhere else in the country." Order of July 30, 1993, at 6 (emphasis added). And, as noted by the panel, the district court has adopted a goal that includes the "integrat[ion of] the Kansas City, Missouri School District ... [a]nd a high standard of quality education." Jenkins, 11 F.3d at 761 (citing the district court's comments at the May 1992 hearing). The only factor the district court saw standing in the way of unitary status for the educational program was continued below average academic performance. Indeed, there is no other evidence in the record to support a conclusion that the educational enhancement (Milliken II ) program of the KCMSD is wanting. Let's examine the facts.
 
 
 52
 Dr. Terrance Stewart of the Missouri Department of Elementary and Secondary Education has been directly involved in the development and implementation of the KCMSD remedy since September of 1984. He testified without dispute at the May 1992 hearing that the KCMSD was awarded the AAA rating in the 1987-1988 school year and since that time has "maintained and greatly exceeded AAA requirements." Joint Appendix A, Vol. V at 1008. Keeping in mind the fact that at the commencement of the remedial plan, school quality equal to that of the SSDs was a major goal, Dr. Stewart testified that "Kansas City School District [now] exceeds what's available in all the suburban school districts in almost every area of classification that we looked at." Id. at 1012. The state then, through Dr. Stewart, discussed each of the Milliken II programs ordered by the district court in 1985, including, but not limited to magnet schools, reduced class size, improved library and computer programs, lower pupil-teacher ratios, full day kindergarten, extended day school, summer school, early childhood education and capital improvements. In every instance, the enhancement of resources and program improvements ordered by the district court had been implemented and were in place no later than the 1988-1989 school year. Most of them predated that school year. Joint Appendix A, Vol. V at 995-1048.
 
 
 53
 Dr. Walter Marks, Superintendent of the KCMSD, also testified with regard to "appropriate buildings ... equipping th[e] buildings with proper teaching equipment, furniture and everything that goes into a building." Joint Appendix A, Vol. IV at 560. According to Dr. Marks, progress "has been fast, it has been pretty comprehensive; and in my judgment it has been well done." Id. However, Dr. Marks testified that the desegregation plan will not be fully implemented until "every school [in] ... the District [has reached] the national norm, the 50th percentile" in student achievement as measured by the testing process. Id. at 615.
 
 
 54
 Finally, Arthur Rainwater testified at length on the specific successes and failures in student achievement. He concluded that the purpose of the remedial plan "was to achieve desegregation and to change the levels of achievement in th[e] District." He further testified:
 
 
 55
 Q. Is it your contention that until those desegregation and achievement levels are met that the remedial plan must continue?
 
 
 56
 A. Yes. That would be my understanding.
 
 
 57
 Q. Regardless of how many years it would take?
 
 
 58
 A. Regardless of how many years it would take.
 
 
 59
 Q. Even 100 years?
 
 
 60
 A. Regardless of how many years.
 
 
 61
 Id. at 701. Id. at 159.
 
 
 62
 Regardless of whether the panel used the exact words "achievement test results" or "test results" it is abundantly clear that the panel felt that student achievement, or lack thereof, was the watermark up to which the tide of desegregation effort must flow. The panel said: "[t]he success of quality of education programs must be measured by their effect on the students, particularly those who have been the victims of segregation." Jenkins, 11 F.3d at 766. The only measurement found anywhere in the evidentiary record is the "achievement test results" which the district court refers to in the order of April 16, 1993. Thus, the state is correct in contending that the panel applied an achievement test standard.
 
 
 63
 There is no question that the reduced educational attainment discerned by the district court in 1984 resulted from acts of racial discrimination and represented "vestiges" of past unlawful segregation. The plan for a high-quality educational program was designed to: (1) attract nonminority students to the KCMSD system, (2) provide all KCMSD students with current and ongoing educational experiences equal to those available in the suburban school districts and (3) reverse the "reduction" in student achievement brought on by segregation and, in this way, remove the vestiges of past racial discrimination. I do not question these goals. The appropriate question now is, have some or all of the goals been met when the proper test is applied?
 
 
 64
 Education, generally, is not among the rights afforded explicit protection under the Constitution. San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 35, 93 S.Ct. 1278, 1297, 36 L.Ed.2d 16 (1973). And, although the Constitution forbids schools from operating in a racially discriminatory fashion, Swann v. Charlotte-Mecklenburg Board of Education disclaims any right to "any particular degree of racial balance or mixing." 402 U.S. 1, 24, 91 S.Ct. 1267, 1280, 28 L.Ed.2d 554 (1971). Thus, by analogy, it seems clear that a victim of discrimination is guaranteed an equal opportunity in a high-quality educational program, but not a specific level of educational achievement under any set of conditions.[5] To require achievement test scores at or above the national norm is to require the school system to be responsible for circumstances beyond its control. Segregated housing patterns, poverty, street violence, drug usage, criminal activities and lack of parental involvement, if they exist in the KCMSD, are not the responsibility of the public school system.
 
 
 65
 For example, in Omaha, Nebraska, a city in which the school district has now been declared unitary after a period of operation under a court enforced remedial program, a gap in mathematic achievement between minority and majority eighth graders has been discovered. At a recent meeting on the problem, Mary Dean Harvey, Director of the Nebraska Department of Social Services stated: "If any plan to close the mathematics proficiency gap [in Omaha] is to succeed, ... it must address the fact that many of the 15,000 babies who will be born in the Omaha area this year will be born out of wedlock to teen-age mothers." Harold W. Andersen, "Fundamental Lesson in Math Proficiency," Omaha World-Herald, Feb. 13, 1994, at 19-A.
 
 
 66
 I recognize that I am citing material outside the record. But, whether or not Ms. Harvey is correct or was correctly quoted and whether or not her concerns have direct applications to minority and majority students in the KCMSD, she makes the valid point that school systems have no control over many conditions that directly affect the educational test results of students in public schools. Thus, such a "test results" standard goes well beyond practicality and the requirements of the Constitution.
 
 
 67
 Freeman, relied upon heavily by the panel, is not to the contrary. The quality of education issue in Freeman was introduced by agreement of the parties and the district court considered the point in connection with its findings on resource allocation. Freeman, --- U.S. at ----, 112 S.Ct. at 1446. The Supreme Court did not have the opportunity in Freeman to consider whether quality of education is one of the factors that must be free from racial discrimination before a school district can be declared partially unitary. See id. --- U.S. at ----, 112 S.Ct. at 1443; Green, 391 U.S. at 435, 88 S.Ct. at 1692. The panel's declaration that "implementation of programs in and of itself is not sufficient" to prove unitary status without rising test scores finds no support in Freeman. Jenkins, 11 F.3d at 765.
 
 
 68
 In fact, the panel seeks to turn Freeman on its head. Although the Freeman district court concerned itself with scores made on the Iowa Test for Basic Skills (ITBS) and the Scholastic Aptitude Test (SAT), the minority students in Freeman did very well on the standardized tests. Freeman, --- U.S. at ----, 112 S.Ct. at 1441. The Freeman district court found, nonetheless, that specific "quality of education programs" concerning teacher qualifications, library books and other educational resources were not yet fully in place. It was lack of educational opportunity, not the results of test scores, that motivated the district court decision in Freeman.
 
 
 69
 In this case, KCMSD students have in place a system that offers more educational opportunity than anywhere in America. The district court stated in its April 16, 1993, order, however, that it was "not satisfied that the District has reached anywhere close to its maximum potential because the District is still at or below national norms at many grade levels." Order of April 16, 1993, at 11. The question is "whether the vestiges of past discrimination ha[ve] been eliminated to the extent practicable." Board of Educ. v. Dowell, 498 U.S. 237, 249-50, 111 S.Ct. 630, 638, 112 L.Ed.2d 715 (1991) (emphasis added). The words "to the extent practicable" have been lost in the shuffle. In our quest to eliminate the vestiges of de jure segregation, we should not forget that:
 
 
 70
 [r]eturning schools to the control of local authorities at the earliest practicable date is essential to restore their true accountability in our governmental system.... It is the duty of the State and its subdivisions to ensure that [the effects of de jure segregation] do not shape or control the policies of its school systems. Where control lies, so too does responsibility.
 
 
 71
 Freeman, --- U.S. at ----, 112 S.Ct. at 1445. I suggest that court supervision of a desegregation remedy for 100 years, as suggested by Associate Superintendent Rainwater, is neither practicable nor desirable.
 
 
 72
 After the opinion in Jenkins v. Missouri, 855 F.2d 1295 (8th Cir.1988) (Jenkins II ), the full court denied en banc consideration. Judge Bowman, joined by Judge Wollman, dissented from the denial stating:
 
 
 73
 This is a case of exceptional importance. The remedies ordered go far beyond anything previously seen in a school desegregation case. The sheer immensity of the programs encompassed by the district court's order--the large number of magnet schools and the quantity of capital renovations and new construction--are concededly without parallel in any other school district in the country. Similarly, in no other case has federal judicial power been used to impose a tax increase in order to provide funding for a desegregation remedy.
 
 
 74
 In addition, the case presents the over-arching question of whether these court-ordered programs and court-ordered taxes are Constitutionally required in order to rectify the vestigial effects of legally mandated segregation (dead now for over thirty years) or instead represent an unsupportable exercise of judicial power in a legislative-style attempt to solve social problems that have their origins in other causes.
 
 
 75
 In over five years on the bench, I have not seen a case more deserving than this one of thoughtful consideration by the entire Court. The decision as it stands appears to arrogate to the federal judiciary vast powers that under the Tenth Amendment are reserved to the states or to the people. I therefore regret that a majority of the Court has voted to deny the petition for rehearing en banc.
 
 
 76
 Jenkins II, 855 F.2d at 1318-19. In retrospect, I regret that I did not join the dissent at that time. In my view, this case, as it now proceeds, involves an exercise in pedagogical sociology, not constitutional adjudication.
 
 III.
 
 77
 Even with the observations I make today, I am not prepared, at least without further briefing and oral argument before the court en banc, to decide that the KCMSD is unitary in the area of equal opportunity to a quality education. I am prepared to say, however, that when faced with the state's request the district court, and the panel, embraced a measure, standardized test results, not required or permitted by the Constitution.
 
 
 78
 If the state's claim carries with it the unstated idea that having put the elements of a quality educational program in place it may now take its money and exit, stage left, leaving the KCMSD to finish the scene alone, I believe that partial unitary status is not at hand. But, if an equal opportunity to receive a quality education is now permanently available to each student in the KCMSD, and is thus available to erase, if the opportunity is reasonably pursued, the vestiges of past discrimination, then unitary status has been reached and control should be relinquished by the federal courts to the state and local governments.
 
 
 79
 At a minimum, this court should consider, en banc, what issues are open and unanswered, except through faulty analysis, and remand the matter to the district court for further proceedings. See Freeman, --- U.S. at ----, 112 S.Ct. at 1450. If the evidence shows that the state and the KCMSD have an affirmative commitment to continue to provide a nondiscriminatory, quality educational program in Kansas City, unitary status should be declared, regardless of what the test scores show.
 
 
 80
 Thus, I dissent from the order denying the suggestion for rehearing en banc.
 
 
 
 *
 The Honorable John R. Gibson was an active judge of this court when the suggestion for rehearing en banc was filed and took senior status on January 1, 1994, before this order was filed
 
 
 [1]
 Milliken v. Bradley, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977)
 
 
 [2]
 Specific details of the remedial plan are set forth in Jenkins v. State of Missouri, 639 F.Supp. 19 (W.D.Mo.1985) and our in en banc opinion in Jenkins I, 807 F.2d 657 (8th Cir.1986)
 
 
 [3]
 The state contends in its petition for rehearing en banc that the cost to date specifically attributable to the desegregation remedy has been in excess of $1.2 billion dollars of which more than $250,000,000 has been spent to develop and maintain the educational programs. Petition for Rehearing at 5. This overall cost figure may be correct although I cannot tell from the evidence reasonably available to me at this time. The $250,000,000 program cost estimate is clearly low if it is intended to include all expenses except those connected with capital improvements. My estimate is derived from management audits in the annual reports of the desegregation monitoring committee that contain desegregation plan costs for the school years 1985-1986 through 1989-1990 and from recent figures the parties supplied to the panel that include expenditures for the school years 1990-1991 through 1992-1993. There may be additional state and federal desegregation dollars being spent outside the framework of the court-imposed plan. For the eight years for which audits and other figures are reasonably available, at least 902,473,047 total desegregation dollars have been spent as of July 31, 1993, of which at least $405,463,357 has been spent on capital improvements
 
 
 [4]
 My conclusion in this regard is, admittedly, based on limited information. In 1991-1992, the total KCMSD expenditure per pupil per year, including capital costs, was $13,500. The same year there were 36,349 students in the system. The 1991-1992 desegregation plan cost was $159,948,057.09 and the total school operation cost ($13,500 X 36,349 students) was $490,711,500
 
 
 [5]
 Although the magnet schools and several other innovative programs are part of the enhanced educational system in the KCMSD and are part of the calculus which must now be considered in deciding unitary status in this case, I do not agree that the novel and expensive undertakings in Kansas City are a necessary part of a constitutionally sufficient effort, even one designed to eradicate the vestiges of discrimination. While Milliken II validated compensatory and remedial programs designed to, over time, free a public school system from the effects of de jure racial segregation, something much less than the present Kansas City program would clearly pass constitutional muster. See Freeman, --- U.S. at ----, 112 S.Ct. at 1448 ("[t]he vestiges of segregation ... must be so real that they have a causal link to the de jure violation being remedied"); Milliken II, 433 U.S. at 282, 97 S.Ct. at 2758 (remedial programs tailored to cure the educational problems created by the constitutional violation); see also Swann, 402 U.S. at 24, 91 S.Ct. at 1280. Indeed, at the outset, the stated remedial goal was to provide schools of equal quality with those found in the average SSD in order to restore the victims of unconstitutional segregation " 'to the position they would have occupied absent such conduct.' " Jenkins II, 855 F.2d at 1301 (quoting district court Order of June 16, 1986). Whether the goal was reached was to be measured by the AAA rating. The evidence clearly establishes that this goal has long since been greatly exceeded and can now be easily maintained without many of the present activities. The magnet schools, for instance, as the nomenclature implies, were primarily designed to draw students back to the KCMSD and, thus, to address the desegregation, as opposed to the compensatory and remedial, prong of the plan