Chinyere JENKINS, et al., Plaintiffs,

v.

SCHOOL DISTRICT OF KANSAS CITY, MISSOURI, et al., Defendants.

No. 77–0420–CV–W–1.

United States District Court, W.D. Missouri, Western Division.

Nov. 17, 1999.

**1059**

Arthur A. Benson, Kansas City, MO, for plaintiffs.

Brian Wood, Kansas City, MO, for American Federation of Teachers.

Mark A. Thornhill, Spencer, Fane, Charles Brown, Kansas City, MO, for Kansas City, MO School District.

Bart A. Matanic, Missouri Attorney General's Office, Jefferson City, MO, for State of Missouri.

### ORDER

WHIPPLE, District Judge.

The Board of Education for the Kansas City Missouri School District ("KCMSD" or "District") has asked the Court to rule that the KCMSD cannot fulfill its constitutional obligation to provide a desegregated education while remaining subject to state accreditation standards mandating the provision of a quality education. The Court finds that the Constitution's standards for a desegregated education do not conflict with the State's standards for a quality education. Moreover, the Court finds that the KCMSD's loss of accreditation for failing to provide a quality education does not mean that it has failed to provide a desegregated education. The KCMSD has complied in good faith with the Court's desegregation decrees since they were first entered in 1984 and is currently operating in compliance with the United States Constitution. Finally, the Court finds that the loss of accreditation will not significantly interfere with the KCMSD's efforts to continue providing a desegregated education in compliance with the Constitution. For these reasons, the Court now enters the following Order:

## I. THE KCMSD'S PENDING MOTION

On October 21, 1999, the Missouri State Board of Education ("State Board") unanimously voted to designate the KCMSD as unaccredited effective May 1, 2000. The State Board based its decision on a detailed review by the Department of Elementary and Secondary Education ("DESE"). In that review, DESE found that the KCMSD had failed to meet any of eleven performance standards used for evaluating and classifying the State of Missouri's public school districts. *See* KCMSD Exhibit 4, "Final Report for the Missouri School Improvement Review" at 72 (October 8, 1999).

The Board of Education for the KCMSD ("School Board") has moved the Court for an Order declaring the State Board's decision void and, if warranted, rejoining the State of Missouri, the State Board, and the State Commissioner of Education as Defendants in this case. *See* KCMSD's Amended Motion for Equitable Relief [Doc. # 4791] (October 25, 1999). The School Board does not challenge the correctness of DESE's findings or the statutory authority of the State Board to remove the District's accreditation. Instead, the School Board argues that the State Board's decision to designate the District as unaccredited impairs the District's ability to comply with the Court's desegregation orders and may ultimately prevent it from achieving unitary status. *Id.* The Court heard evidence and oral arguments on the KCMSD's motion on November 1st and 2nd, 1999. While preserving its objection to insufficient service of process, the State of Missouri made a limited appearance at the hearing to oppose the KCMSD's motion.

## II. MOTION TO REJOIN THE FORMER STATE DEFENDANTS

The Court previously released the State of Missouri, the Governor, the State Board, and the Commissioner of Education

(collectively referred to as the "former State Defendants") after finding that they had fully paid all of their funding obligations under the terms of the May 21, 1996 Settlement Agreement with the KCMSD. *See* Order [Doc. # 4760] (January 28, 1999). The 1996 Settlement Agreement, which was modified and ultimately approved by the Court in March 1997, provided that the former State Defendants would pay the KCMSD $320 million in desegregation funding over a three-year period. *See Jenkins v. Missouri,* 959 F.Supp. 1151, 1169 (W.D.Mo.1997). Upon final payment of that amount, the former State Defendants would be entitled to an Order dismissing them from the case. *See id.* at 1172 ("holding that any remaining obligation of the State to the school children of Kansas City may be discharged by the payment of funds provided for in the Agreement"). The former State Defendants paid the final installment to the KCMSD on December 3, 1998; the Court dismissed them from the case with prejudice on January 28, 1999. *See* Order [Doc. # 4760] (January 28, 1999).

Although the KCMSD's motion requests rejoinder of the State of Missouri, the State Board, and the State Commissioner of Education, the District's attorneys did not present any oral arguments on this issue. Moreover, the KCMSD produced no legal authority for a court's ability to rejoin former parties after it has dismissed those parties from the case with prejudice. Proper respect for the finality of the Court's dismissal of the former State defendants weighs heavily against rejoinder. The Court holds that circumstances in this case do not presently warrant consideration of the KCMSD's motion for rejoinder of the former State Defendants. Rejoinder is DENIED.

### III. MOTION TO VOID THE UNACCREDITED DESIGNATION

The KCMSD's motion also asks the Court to declare the State Board's accreditation decision void *ab initio.* The KCMSD argues that an unaccredited designation will cripple its ability to comply with the Court's remedial orders and achieve unitary status. *See* KCMSD's Amended Motion for Equitable Relief at 3–4. To resolve the merits of the KCMSD's arguments, the Court finds it necessary to review the history of this case, the basis for the State's accreditation decision, and the recent events that have brought the State and the parties to this point.

### A. Background and Findings of Fact

### 1. Initial Liability and Remedy

In 1984, the Court held that the State of Missouri had mandated the operation of a dual school system prior to 1954. *See Jenkins v. Missouri,* 593 F.Supp. 1485, 1504 (W.D.Mo.1984). The Court also held that the State and the KCMSD had not fulfilled their constitutional obligations to dismantle that system. *Id.* The Court found two vestiges of the former dual school system still lingering in the KCMSD: (1) the existence of 25 racially isolated schools with over 90% black students, and (2) a "system wide reduction in student achievement." *See Missouri v. Jenkins,* 515 U.S. 70, 74–75, 115 S.Ct. 2038, 2042, 132 L.Ed.2d 63 (1995) (*Jenkins III*) (citing *Jenkins v. Missouri,* 639 F.Supp. 19, 24 & 36 (W.D.Mo.1985)). The Court ordered the KCMSD and the State to prepare, implement and fund a remedial plan that would eliminate these lingering effects of prior segregation and achieve a truly unitary school system. *Jenkins,* 639 F.Supp. at 24 (W.D.Mo.1985).

The resulting desegregation plan was intended to create a premiere school district with excellent facilities, low student-teacher ratios, and high-quality education programs. *Id.* at 26–41. The ultimate purpose was to raise the achievement of the KCMSD's existing students as well as attract white suburban children into the KCMSD to neutralize the racial imbalance and raise overall test scores. *Id.* at 26–29, 37–41. The Court's desegregation plan has been described as "the most ambitious

and expensive remedial program in the history of school desegregation." *Jenkins III*, 515 U.S. at 79, 115 S.Ct. at 2044 (citing *Jenkins*, 19 F.3d 393, 397 (8th Cir.1994) (Beam, J., dissenting)).

### 2. The Directives of Jenkins III

In 1995, the United States Supreme Court held that portions of the court-ordered desegregation plan were unconstitutional because they went "beyond the scope of [the District Court's] broad remedial authority." *Jenkins III*, 515 U.S. at 94, 115 S.Ct. at 2052. The Supreme Court carefully prescribed the scope of this Court's remedial authority—"to remedy the violation to the extent practicable." *Id.* at 102, 115 S.Ct. at 2056. The Supreme Court acknowledged that racial isolation in 25 KCMSD schools was one effect of prior segregation that must be remedied to the extent practicable. *Id.* at 90, 115 S.Ct. at 2050. The Supreme Court also directed the Court to identify the precise effects of prior segregation on minority student achievement so that it could tailor the remedy to the academic achievement injuries suffered. Along this line, the Supreme Court instructed the Court to "sharply limit, if not dispense with, its reliance on" student performance on test scores:

> Just as demographic changes independent of *de jure* segregation will affect the racial composition of student assignments, so too will numerous factors beyond the control of the KCMSD and the State affect minority student achievement. So long as these external factors are not the result of segregation, they do not figure into the remedial calculus. Insistence upon academic goals unrelated to the effects of legal segregation unwarrantably postpones the day when the KCMSD will be able to operate on its own.

*Id.* at 101–02, 115 S.Ct. at 2055–56.

The Supreme Court reminded the Court that the "State and the KCMSD are entitled to a rather precise statement of their obligations under a desegregation decree," *id.* at 101, 115 S.Ct. at 2055, and that "its

end purpose is not only to remedy the violation to the extent practicable, but also to restore state and local authorities to the control of a school system that is operating in compliance with the Constitution." *Id.* at 102, 115 S.Ct. at 2056. The "ultimate inquiry is whether the constitutional violator has complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination have been eliminated to the extent practicable." *Id.* at 89, 115 S.Ct. at 2049 (quoting *Board of Educ. of Oklahoma City Pub. Sch. v. Dowell*, 498 U.S. 237, 250, 111 S.Ct. 630, 638, 112 L.Ed.2d 715 (1991)). As part of this inquiry, the Court must consider whether "retention of judicial control is necessary or practicable to achieve compliance with the [desegregation] decree." *Id.* (quoting *Freeman v. Pitts*, 503 U.S. 467, 491, 112 S.Ct. 1430, 1446, 118 L.Ed.2d 108 (1992)).

### 3. The March 1997 Transition Order

Following the dictates of *Jenkins III*, the Court conducted a three week hearing in January 1997. The purpose of the hearing was threefold: (1) to determine whether the State and KCMSD had eliminated the vestiges of prior segregation in the District; (2) if they had not, to identify the extent of the vestiges that still lingered; and (3) to give the State and KCMSD a precise statement of their obligations in the remedial effort to cure those remaining vestiges. *Jenkins*, 959 F.Supp. 1151, 1162 (W.D.Mo.1997). Prior to the January 1997 hearing, the KCMSD and the State of Missouri entered into a settlement agreement in which the State agreed to pay $320 million over a three-year period in exchange for a release from further liability. *Id.* at 1169. The Court approved the settlement agreement, finding that the State would fulfill its remedial obligations once it fully paid all sums due under the agreement. *Id.* at 1172.

Although the Court relieved the State from further liability under its desegregation decree, the Court also held that the

KCMSD had not yet fulfilled its constitutional obligation to eliminate the vestiges of prior segregation to the extent practicable. *Id.* at 1165. Using student achievement scores on the Iowa Test of Basic Skills, the Court determined that an academic achievement gap existed between white and black students in the KCMSD of approximately ten normalized curve equivalents ("NCE's"). *Id.* Moreover, the Court found that 26% of this achievement gap was caused by prior segregation in the form of a "race effect" and low teacher expectations of black students. *Id.* The Court's finding translated into a mandate that the KCMSD do everything practicable to eliminate the academic achievement gap between black and white students by 2.6 NCE's. *Id.*

The Court also found that the KCMSD had not yet achieved unitary status with regard to its racial isolation vestige. *Id.* at 1167. The Court observed that in the years prior to the Supreme Court's decision in *Jenkins III,* white enrollment in the KCMSD had decreased at a lower rate than in previous years. *Id.* at 1165. Using the enrollment of white, non-resident students and a district-wide transportation plan, the KCMSD had successfully reduced the number of racially isolated schools. *Id.* The number of schools whose enrollments contained greater than 50% white students dropped from 17 schools in 1986 to zero schools in 1996. Likewise, the number of schools with enrollments greater than 90% minority dropped from 25 in 1986 to 16 in 1996. *Id.* Experts testified that the KCMSD had achieved a relatively high degree of racial balance by 1996 and that it would be counterproductive to mandatorily reassign students. *Id.* at 1166.

After *Jenkins III* ended the Court's remedial plan of "desegregative attractiveness," the KCMSD could no longer provide transportation for its non-resident students or maintain its expensive district-wide magnet system. *Id.* at 1166. Enrollment of white, non-resident students declined by 1476 students in 1995 and 1996. *Id.* at 1167. The Court found that it could not determine the full effects of the loss in white student enrollment on the KCMSD's racial isolation vestige. *Id.* Because the burden rested on the State and the KCMSD to prove that the racial isolation vestige had been eliminated to the extent practicable, the Court held that the KCMSD had not yet achieved unitary status with respect to that vestige. The Court ordered the KCMSD to assess the ramifications of *Jenkins III* on student enrollment in the KCMSD. The Court indicated that, given the loss of white, non-resident enrollment and the necessity of a greatly reduced transportation budget, the KCMSD should attempt to achieve a substantial measure of racial balance in as many schools as possible. *Id.* at 1166–67.

The Court made one additional, relevant[1] finding as to the KCMSD's failure to achieve unitary status in March 1997: the capital improvement plan that began under the Court's prior remedial program had not yet been completed. *Id.* at 1168. The Court estimated that these renovations could be finished by March 1999 and decided to withhold a declaration of unitary status as to the KCMSD's facilities until that time. The Court ordered the KCMSD to finish its facilities upgrade within a two-year period. *Id.*

These three findings—(1) a 2.6 NCE gap caused by prior segregation, (2) an unknown racial imbalance due to the loss of non-resident white enrollment in 1995 and 1996, and (3) an incomplete facilities upgrade with two more years to completion—stood alone as the remaining vestiges of prior segregation in the KCMSD in March 1997. These three vestiges also embodied the whole of the Court's modi-

---

1. Although the Court also ordered the KCMSD to attempt to achieve a plus or minus range of 15% in faculty assignments at 80% of the elementary schools in the KCMSD, it later abrogated this order. The Court acknowledged that an order related to faculty assignments went beyond the scope of the violation and could not be constitutionally imposed on the KCMSD. *See* Orders [Doc. # 4658, # 4708] (February 12, May 28, 1998).

fied remedial orders. While the Court ordered the KCMSD to achieve unitary status by eliminating the three vestiges enumerated above, it also acknowledged the Supreme Court's directive that a voluntary desegregation effort need not actually eliminate all lingering vestiges of segregation so long as all practicable steps are taken in the effort to do so. *Id.* at 1155 ("No longer must the Court eliminate the vestiges of segregation 'root and branch.' Instead, the Court must only assess whether everything 'practicable' has been done to eliminate the vestiges of prior discrimination."(internal citations omitted)). For this reason, the Court included in its modified remedial order several directives that should be placed in the category of "practicable steps." The Court directed the KCMSD to file a plan that would guide its transition to unitary status and to modify its accounting methods so that actual expenditures could be reconciled with budgeted amounts. *Id.* at 1179. The Court believed these actions were necessary, not because they were directly tied to vestiges of prior segregation, but because they were necessary for an effective transition to unitary status. *Id.* at 1168.

### 4. The KCMSD's Transition Plan and The Practicable Steps to Unitary Status

The KCMSD filed its Transition Plan on schedule in August 1997. *See* KCMSD's Plan for Transition to Unitary Status (August 15, 1997). Pursuant to the Court's directives, the Transition Plan included a security plan for keeping District schools safe, announced modifications to the KCMSD's accounting methodology, and listed the remaining projects to be completed under the court-ordered capital improvement program. *See* Transition Plan at 48–69. The Transition Plan laid out the KCMSD's plans for restructuring to reduce expenses, including the reduction of central administration and consolidation of magnet themes. *See* Transition Plan at 70–118. The Plan also set forth the KCMSD's strategy for implementing student attendance zones to reduce transpor-

tation expenses and maintain a practicable racial balance in student enrollment. *See* Transition Plan at 82–83, 119–128.

With respect to the academic achievement vestige, the KCMSD identified five major factors that have contributed to the perpetuation of the 2.6–NCE gap caused by prior segregation: (1) low expectations by teachers; (2) lack of a core curriculum; (3) ineffective staff development; (4) the lack of a comprehensive assessment system; and (5) the absence of real accountability at all levels. *See* Transition Plan at 16–17. Having identified these problems, the KCMSD methodically set forth its principle objectives for reducing the academic achievement gap. The KCMSD proposed to implement a new curriculum that was more closely tied to student learning and performance by grade level. *See* Transition Plan at 21–22, 26–28. The KCMSD announced new professional staff development efforts targeted at raising teacher expectations for urban learners, promoting learner-centered classroom practices, and emphasizing language and concept development with a strong focus on reading. *See* Transition Plan at 21–22, 28–46. The KCMSD also proposed implementing a comprehensive assessment and accountability system and a strategic instructional plan to tie all of these reform measures together. *See* Transition Plan at 21–25, 46–47.

Shortly after the KCMSD presented its Transition Plan to the Court, the Court appointed a new Desegregation Monitoring Committee ("DMC") consisting of three professional educators. *See* Order [Doc. 4580] (August 21, 1997). The Court gave the DMC specific areas of responsibility for overseeing the KCMSD transition and carefully outlined the DMC's role in that process. Pursuant to the Court's charge, the DMC has closely monitored the KCMSD's transitional progress, especially with respect to the academic achievement gap.

In four semi-annual reports to the Court, the DMC has consistently ex-

pressed its belief that the essential principles of the KCMSD Transition Plan are both practicable and necessary to eliminate the vestiges of discrimination. In its first report on April 15, 1998, the DMC stated that it

> believes that if the KCMSD can implement its core curriculum[,] have quality instruction of the curriculum throughout the KCMSD[,] and implement a comprehensive instructional/management plan or a "Strategic Instructional Plan" as described in the Transition Plan, the KCMSD will achieve or promote the achievement of closing the academic achievement gap.

*See* DMC Report to the Court at 5 (April 15, 1998). Six months later, on October 14, 1998, the DMC noted that

> The KCMSD is now entering its second academic year since the submission of the Transition Plan. That plan detailed the components that are necessary to meet the Court ordered goals. Specifically, essential components of the Transition Plan were designed to reduce the academic achievement gap by changing the KCMSD's low expectations for its urban students; changing the KCMSD uneven quality of instruction; and changing the KCMSD's fragmented and uncoordinated professional staff development, assessment and accountability.

*See* DMC Report to the Court at 7–8 (October 14, 1998). Finally, in the DMC's last report to the Court, it agreed with "Plaintiffs" counsel that if the KCMSD could make "huge strides" towards implementing the curriculum, classroom practices, professional development, accountability, and assessment [components set forth in the Transition Plan], then the KCMSD would have done everything practicable to close the academic achievement gap between black and white students by 2.6 [NCE's] and might be declared unitary. *See* DMC Report to the Court at 1–2 (October 22, 1999).

The Court has relied on the expertise of its DMC and the professional experience of those persons who developed the KCMSD's Transition Plan to hold that implementation of the principles set forth in that Plan would constitute the practicable steps necessary for unitary status. *See e.g.* Order at 2 [Doc. # 4772] (June 17, 1999). Thus, the Court has directed the KCMSD that in its effort to close the achievement gap and maintain an appropriate racial balance, the KCMSD should focus on these practicable steps: (1) a realistic budget that can be reconciled with actual expenditures; (2) a completed facilities upgrade; (3) a fully implemented curriculum reflected in classroom instruction; (4) a professional development plan; (5) an assessment plan; and (6) an accountability plan. *Id.*

At different times in the last two years, the KCMSD, Plaintiffs, American Federation of Teachers ("AFT"), and DMC have told the Court about other issues that they believe should be addressed by the KCMSD. These issues range from the need for more effective leadership in the KCMSD, to recruitment of teachers and other certificated personnel, to planning for the effects of charter schools. *See e.g.* DMC Reports to the Court (October 14, 1998; April 15, 1999; October 22, 1999). The Court has encouraged the parties and DMC to address these issues, and even issued Orders regarding these matters. *See e.g.* Order [Doc. # 4738] (October 23, 1998); Order [Doc. # 4772] (June 17, 1999). Leadership, recruitment, and effective planning are critical issues for any organization that is attempting to achieve lofty goals. These matters are part of the remedial calculus, however, only to the extent that they affect the KCMSD's efforts to take all practicable steps toward eliminating the vestiges of prior segregation. *See e.g.* Order at 3 [Doc. 4772] (June 17, 1999) ("[A]n uncompromised leader with intelligence, common-sense, managerial experience, and personal integrity can begin to achieve all of these [practicable steps] quickly and adeptly.").

### 5. The Creation of Charter Schools

In addition to operating under its Transition Plan principles and the Court's remedial directives, the KCMSD has been affected by several actions of the former State Defendants that are (technically) unrelated to this case. The first such notable action involves the State's passage and implementation of charter schools legislation. Passed in June 1998, Senate Bill 781 included provisions allowing for the creation of charter schools—"independent, publicly supported school[s]." Mo.Rev. Stat. § 160.400 (Supp.1998); 1999 Mo. Legis. Serv., S.B. 781 (West 1999). Charter schools may only operate in St. Louis and Kansas City. These schools can only be created through the sponsorship of the local school district, a four-year college or university located in the district or in an adjacent county, or a community college located in the district. One out of every three charter schools that a sponsor supports must actively recruit and focus on the needs of dropouts and high-risk students. Id.

Charter schools are exempt from all school laws, except that they must be non-sectarian and comply with health, safety and minimum educational standards. Charter schools also must admit any student without regard to race, ethnicity, national origin, disability, gender, income level, language proficiency or athletic ability. Charter schools do not participate in the state accreditation process and are not subject to classification by the State Board. Id. Neither the local school board nor the State Board has the authority to deny an approved charter except on the grounds that its application does not meet the statutory requirements. Once a charter school is approved for sponsorship, it may begin enrolling students residing in the district where it is located. The charter school's pupils are then counted in the school district's enrollment numbers for the purpose of collecting state aid. Id. The school district must pay each charter school an amount based on the total enrollment of the charter school multiplied by the tuition for each charter school student, multiplied by the projected daily attendance of those students. See Testimony of Bonnie McKelvy, Transcript at 134 (November 1, 1999).

Fifteen charter schools have opened in the KCMSD during the 1999–2000 school year. See Testimony of Bonnie McKelvy, Transcript at 133. These fifteen charter schools have enrolled 4,354 students, 3,072 of which are former KCMSD students. Id. at 134. Based on this enrollment figure, the KCMSD will have to pay an estimated $23.8 million to the charter schools within its boundaries in fiscal year 2000. Id. at 140; KCMSD Exhibit 6 (November 1, 1999). The KCMSD will not be able to reduce expenditures by that same amount, however, and anticipates an operating deficit for fiscal year 2000 of $3.4 million.

Two additional charter schools within the KCMSD's boundaries received sponsorship prior to the State Board's decision to designate the KCMSD as unaccredited. Id. at 135–36. These two schools are likely to enroll approximately 480 pupils total for the 2000–2001 school year. Witnesses for the KCMSD fear that the State Board's decision to designate the District as unaccredited will prompt an increased rate of charter school applications and enrollment, perhaps by as much as 50 percent. Id. at 147. KCMSD Chief of Staff Cheryl Shannon testified that she believed as many as ten new applicants are seeking sponsorship for charter schools, less than one month after the State Board's decision. See Testimony of Cheryl Shannon, Transcript at 72–73 (November 1, 1999). The KCMSD submitted into evidence a flyer that was recently posted at Lincoln College Preparatory Academy, the District's premiere academic high school, soliciting interest in creating a college preparatory charter school. See KCMSD Exhibit 1 (November 1, 1999). The KCMSD claims that if charter school enrollment increases, its projected deficit also will grow. See Testimony of Bonnie McKelvy, Transcript at 142. The District argues that its only method for reducing

expenditures in line with charter school payments will be to restructure—closing and consolidating schools for greater savings. *Id.* at 148. Because significant restructuring is thought to disrupt educational progress, the KCMSD argues that the State's enactment of charter school legislation further increases the damaging effect of an unaccredited designation on the KCMSD.[2]

### 6. The Accreditation Process and the State Board's Decision to Designate the KCMSD as Unaccredited

The state action that ultimately led to the pending motion is the development and implementation of the Missouri School Improvement Program ("MSIP") review process. DESE developed the MSIP process in 1989 to establish a mechanism by which it could evaluate and classify school districts. *See* Testimony of Marilou Joyner, Transcript at 249–51 (November 1, 1999). Under the MSIP program, DESE evaluates each school district on the basis of resource, process, and performance standards. *See* Missouri School Improvement Program Standards and Indicators Manual at 2–3 (visited March 3, 1999)< http://services.dese.state.mo.us /divschsvs/supervision/standards/> (hereinafter cited as "Standards and Indicators Manual"). Districts that do not meet a minimum number of the required standards are designated as "unaccredited" and face sanctions imposed by statute and state regulation. *See* Testimony of Marilou Joyner, Transcript at 250–51 (November 1, 1999). DESE believes that the initiation of sanctions operates as an incentive for unaccredited school districts to perform to higher standards. *Compare id.* at 251 ("the districts that were unaccredited (under the old system) typically remained unaccredited year after year.") *with id.* at 256 ("we currently have no district unaccredited at this time, so they have all been able to recover at least provisional accreditation" (under the new system).) *with id.* at 261 ("My experience with that is, again, that the initial [unaccredited] designation is a real shock to the system, but I believe that once it is accepted ... that's when you can get people motivated.").

Under the MSIP program, DESE reviews the State's school districts every five years. The KCMSD underwent its first-cycle review in 1993 and received a "provisionally accredited" designation. *Id.* at 265. It was scheduled for another MSIP review in January 1998, until DESE, under the leadership of the Dr. Robert Bartman, the Commissioner of Education, decided to postpone the KCMSD's regularly-scheduled MSIP review. *See* State's Exhibit 2, "Memorandum from Marilou Joyner to Commissioner Bartman" (April 7, 1997). DESE's decision to postpone the KCMSD's review was prompted by this Court's March 1997 Order. In that Order, the Court asked Dr. Bartman and DESE to guide and oversee the KCMSD during its transition to unitary status. *See Jenkins,* 959 F.Supp. 1151, 1178–79 (W.D.Mo. 1997). Dr. Bartman responded to the Court's request in a letter dated April 16, 1997. Dr. Bartman's letter indicated that

> [b]ecause of the complicated issues involved in the transition period and the time commitment which would be required to be successful, I would not be able to provide the day-to-day guidance implied from the Court order.... As I have stated earlier, I and our department stand ready, willing, and able to offer ... any technical assistance we can provide.

---

**2.** The Court notes that the KCMSD focuses solely on the adverse impact that charter schools may have on its operations. The ultimate purpose of this case, however, is to ensure a desegregated education for the plaintiff schoolchildren. The plaintiff class is defined as all present and future KCMSD students and includes all charter school students in Kansas City. Thus, while an increase in charter schools may indeed affect the KCMSD (and that is not a question to be decided here), that increase may be just as likely to advance the quality and unitariness of education for Kansas City pupils. Additionally, one might hope, as the state legislature apparently does, that the competition created by charter schools may further improvements in the education that the KCMSD provides.

*See* Letter of Dr. Robert Bartman as read into Evidence, Transcript at 38 (April 17, 1997). To help fulfill his commitment to the Court, Dr. Bartman decided to postpone the KCMSD's regularly-scheduled MSIP review, which DESE believed was likely to show that the KCMSD did not qualify for accreditation. *See* State's Exhibit 2, "Memorandum from Marilou Joyner to Commissioner Bartman" (April 7, 1997). Instead, Dr. Bartman offered to conduct a "technical assistance review" for the KCMSD. *Id.* This technical assistance review would help the District identify effective instructional practices as well as its needs and concerns. *Id.*

DESE conducted its technical assistance review of the KCMSD in December 1997. *See* State's Exhibit 3, Technical Assistance Report (January 28, 1998). DESE summarized its findings as follows:

> The district continues to have significant problems in the area of student performance. Only one of the 12 performance indicators is met at this time. To that end, it is imperative that the KCMSD nurture a process by which all efforts in the district are focused on changing and improving all aspects of performance of the students in the district.

> At this time, the district does not have a single, districtwide school improvement plan with measurable performance objectives which guides the overall improvement of student performance. Positive, districtwide improvement will occur only if there is a strong linkage between the district's planning efforts and the building-level planning efforts. Currently, there is no coordinated, formalized effort to review and evaluate programs and services in the district. Information obtained from such a comprehensive evaluation of programs and services within the district could prove invaluable in the development of a comprehensive improvement plan for the district and the buildings.

> In developing the district's overall plan, careful attention should be given to linking curriculum with instruction, and instruction to professional development.

Although the KCMSD offers a wide array of professional development activities, the district should give careful consideration to ensuring that professional development activities transcend activities at the awareness level to a skills development competency and implementation level. Professional development activities should be systematically focused on improved and varied instructional strategies to meet the educational needs of the students within the district.

> In a related matter, the district should consider developing within the comprehensive plan a method by which building leadership can remain consistent over a period of time. The frequent turnover of building leadership, as well as central office leadership, serves as a barrier to the implementation of plans and improvement of student performance.

*Id.* at 48.

A little over one year after DESE's technical assistance review, DESE conducted its formal MSIP review of the KCMSD. *See* KCMSD Exhibit 4. The findings from this review were presented to the State Board for accreditation purposes. *See* Testimony of Marilou Joyner, Transcript at 276 (November 1, 1999). DESE found that the KCMSD passed all the MSIP resource and process requirements, but failed to meet any of DESE's eleven performance standards. *See* KCMSD Exhibit 4 at 72.

The first three MSIP performance indicators measure general academic achievement. *See* Standards and Indicators Manual, § 16.1 at 28. DESE compiles student scores on the Missouri Assessment Program ("MAP") tests for two consecutive years. *Id.* The MAP tests cover math, communication arts, and science in grades 3–5, 6–8, and 9–11. *See* KCMSD Exhibit 4 at 67–68. DESE rank the students' scores and places them in four different scoring levels. *See* Standards and Indicators Manual, § 16.1 at 28–29. DESE then compares the percent of students in each scoring level between the two consecutive

years. *Id.* In the MSIP review of the KCMSD, DESE found that the District had high percentages of students in the lowest two scoring levels and little improvement between 1998 and 1999. *See* KCMSD Exhibit 4 at 67–68. The KCMSD received two out of 36 possible points on DESE's scoring rubric for these three performance indicators. *See* KCMSD Exhibit 2 (November 1, 1999). Twenty-four points (eight points on each standard) were required to meet DESE's performance standards. *Id.* Consequently, DESE reported that the KCMSD failed to meet its three general achievement performance standards. *See* KCMSD Exhibit 4 at 72.

DESE's fourth and fifth performance indicators measure the reading achievement of third and seventh or eighth grade students to determine if those students are reading at an acceptable level. *See* Standards and Indicators Manual, § 16.2 at 29. Based on an analysis of the MAP reading assessment, DESE found the KCMSD had low percentages of third and seventh grade students who were reading at an acceptable level or who significantly improved between 1998 and 1999. *See* KCMSD Exhibit 4 at 69. DESE reported that the KCMSD failed to meet its two reading achievement performance standards. *Id.* at 72.

The sixth, seventh, eighth, and ninth performance indicators measure a school district's success at preparing its students for post-secondary education and/or employment. *See* Standards and Indicators Manual, § 16.3 at 29. DESE measures the percent of graduates scoring at or above the national average on the ACT or SAT (sixth performance standard); the percent of graduates that earn a college preparatory studies certificate, earn college credit while in high school or receive a score of three or higher on an Advanced Placement Test (seventh performance standard); the percent of graduates who complete vocational education programs approved by DESE (eighth performance standard); and the percent of graduates who complete vocational education programs approved by the Department of Elementary and Secondary Education and are placed in occupations relating to their training, continue their education or are in the military services (ninth performance standard). *Id.* In its review of the KCMSD, DESE found a small but slightly improved percentage of KCMSD graduates scoring above the national average on the ACT or SAT, a small but improving percentage of credits earned in advanced classes, a low percentage of vocational completers, and an average percentage of vocational completers who were subsequently placed in relevant occupations, continued education, or military service. *See* KCMSD Exhibit 4 at 69–70. The KCMSD only earned fifteen of 48 possible points on DESE's scoring rubric for career preparation. *See* KCMSD Exhibit 3. Thirty-six points were required to pass DESE's performance standards in this area. *Id.* DESE reported that the KCMSD failed to meet its career preparation performance standards. *See* KCMSD Exhibit 4.

The last two performance indicators measure a school district's ability to keep its pupils in school. *See* Standards and Indicators Manual, § 17.1 at 29–30. DESE examines the percent of students who drop out of school between ninth and twelfth grades, as well as the percent of students who are in regular daily attendance. *Id.* The KCMSD had a relatively high and increasing dropout rate (from 9.07% in 1998 to 11.86% in 1999) and a relatively low daily attendance rate (from 87.68% in 1997 to 86.52% in 1998). *See* KCMSD Exhibit 4 at 71. The KCMSD failed to earn any points out of 24 possible on DESE's scoring rubric for educational persistence. *See* KCMSD Exhibit 3. Eighteen points were required. *Id.* Consequently, DESE reported that the KCMSD failed to meet its educational persistence performance standards. *See* KCMSD Exhibit 4 at 72.

Acting upon DESE's findings and its statutory authority, *see* Mo.Rev.Stat. § 161.092(9), the State Board voted on Oc-

tober 21, 1999 to reduce the KCMSD's classification from "provisionally accredited" to "unaccredited." Missouri law prescribes a number of consequences for unaccredited school districts. Students in an unaccredited school district may choose to attend an accredited district, subject to their ability to enroll there, in the same or an adjoining county. *See* Mo.Rev.Stat. § 167.131; 5 C.S.R. 50–340.010(1)(A)(5). The unaccredited district must notify its students and the parents of its students of their transfer rights. The unaccredited district must also pay tuition for the transferring students and the costs of their transportation to schools in the accredited district. *Id.* DESE must hold a public hearing in the unaccredited district to review the District's plans for regaining accredited status or to offer any technical assistance it can provide. Mo.Rev.Stat. § 162.081. In the KCMSD, and in other school districts where the board of education does not anticipate a return to accredited status, the State Board *may* appoint a special administrative board to run the district. *Id.* If the unaccredited district cannot regain accreditation within two successive school years, its corporate organization will lapse under state law. *Id.* Before the unaccredited district lapses, its governing body must submit a plan to the district's voters to divide the district if it cannot regain accreditation within three years. *Id.* After lapse, the State Board may appoint a special administrative board to replace the local school board, attach the territory of the lapsed district to other districts, or establish one or more districts within the territory of the lapsed district. *Id.*

In addition to the statutory consequences of an unaccredited designation, the KCMSD contends that unaccredited status carries indirect consequences that can be just as significant. The KCMSD argues that it will be more difficult to recruit and keep qualified personnel. Tenured teachers at retirement age may simply choose to retire instead of teaching in a failed district, while young, non-tenured teachers may leave for fear they will not be able to serve the full five years required for tenure. The KCMSD also argues that academically motivated students will leave for fear of the District's unaccredited designation on their chances to get into college. The loss of achieving students will hurt the KCMSD's test scores as well as the academic environment of the District's classrooms. Essentially, the KCMSD contends that these indirect effects make recovery from an unaccredited designation nearly impossible to achieve.

### 7. The KCMSD's Current Transition Status

Notwithstanding DESE's findings of poor academic performance in the KCMSD, the Court believes that the District has made significant progress toward its transition goals and the Court's remedial targets. For instance, the school consolidations and budget reductions necessitated by the Supreme Court's decision in *Jenkins III* have now been completed. The ramifications of that decision on the KCMSD's racial balance can easily be determined. Unfortunately, the number of racially isolated schools with over 90% minority enrollment has increased from 16 to 27. *See* KCMSD Student Census Counts (September 25, 1996; January 29, 1997; September 24, 1997; January 28, 1998; September 30, 1998; January 27, 1999). While these figures are certainly not optimal, they are extremely positive for two reasons. First, the overall percentage of minority students in the KCMSD has increased from 73.5% in 1986, when there were 25 schools with greater than 90% minority enrollment, to 81.8% in January 1999. *See* State's Exhibit 3a (Unitary Status Hearing, January 1997); KCMSD Student Census Counts (September 25, 1996; January 29, 1997; September 24, 1997; January 28, 1998; September 30, 1998; January 27, 1999). Considering this 8.3% increase in overall minority enrollment, an increase of only two schools with greater than 90% enrollment can be considered a positive factor.

Second, the increased number of KCMSD schools with over 90% minority enrollment is positive in light of the massive reduction in district-wide student transportation necessitated by the Supreme Court's decision in *Jenkins III*. After 1997, the KCMSD was forced to close multiple schools and create a transportation plan centered around attendance zones. *See* Transition Plan at 82–83. The creation of attendance zones necessarily led to increased racial imbalance because of demographic conditions in the KCMSD—conditions unrelated to prior *de jure* segregation and far beyond the control of District officials. *Cf. Jenkins III,* 515 U.S. at 91, 115 S.Ct. at 2050 (rejecting, again, the suggestion that "schools which have a majority of [African–American] students are not 'desegregated' whatever the racial makeup of the school district's population and however neutrally the district lines have been drawn and administered."). Even with the construction of a few new schools, the redistribution of students from Border Star, Faxon Annex, Greenwood, Holmes, Bingham, Metro Tech, and Southwest was certain to increase the percentage of minorities in the District's other schools. With the overall percentage increase in minority enrollment, and the redistribution of students made necessary by transition period budget reductions, the KCMSD can be credited with a careful, well-conceived attendance zone and interdistrict magnet plan that has maintained racial balance within the District's schools to the extent practicable.

The KCMSD also appears to have substantially completed the essential components of the court-ordered capital improvement program. The KCMSD has completed work on all of the construction and renovation projects it outlined in its Transition Plan and all but two of the demolition projects announced there. *See* Transition Plan at 64. In addition, the KCMSD has effectively reconfigured its schools to establish comprehensive schools and consolidate magnet schools in line with the Transition Plan and the Stipulation and Agreement filed on April 21,

1998. *See* Transition Plan at 65–68; Stipulation and Agreement [Doc. # 4698] (April 21, 1998). Finally, the KCMSD has developed new long and short-range plans for further maintenance, renovation, and/or replacement of its facilities. *See* KCMSD Exhibit 4 at 61.

With respect to the KCMSD's efforts at closing the academic achievement gap, the Court notes that the KCMSD has developed sound educational policies consistent with the Court's remedial orders. The KCMSD submitted its Professional Development, Assessment and Accountability Plans to the Court last Spring. *See* KCMSD Motion for Approval of Plans [Doc. # 4761] (January 29, 1999) (submitting plans with motion for approval); KCMSD Updated Accountability Plan [Doc. # 4765] (April 15, 1999). In these plans, the KCMSD reaffirmed its commitment to:

(1) deliver a high quality curriculum that describes what students should know and be able to do;

(2) demonstrate high expectations for achievement through effective instructional practices;

(3) use district and state assessments that measure the level to which students are able to demonstrate the standards identified in the Core Curriculum and [Missouri's] Show–Me–Standards;

(4) implement an accountability process that provides specific data to assist policy makers and school leaders in making informed on-going decisions to increase student learning ...; and

(5) provide relevant and effective professional development that addresses the obstacles to raising student achievement [and also] provides on-going support to educators in administration of assessments, interpretation of test data, and appropriate instructional strategies based on test results.

*See* KCMSD Motion for Approval of Plans [Doc. # 4761], Exhibit A at 1–2 (January 29, 1999). The DMC reviewed and ap-

proved the KCMSD's instructional plans prior to their approval by the Court.

Recently, the DMC noted that the new Superintendent of Schools, Benjamin Demps Jr., was already "moving forward to implement the core curriculum, classroom practices, professional development, accountability, and assessment [plans]." *See* DMC Report to the Court at 2 (October 22, 1999). Moreover, in the KCMSD's MSIP review, DESE found that

[T]he district has recently developed and implemented a Core Curriculum for grades K–12 and has focused professional development activities and instructional evaluations on the implementation of this curriculum. This new curriculum represents a significant improvement for the district, and interviews indicate this improvement has been recognized by the staff.

*See* KCMSD Exhibit 4 at 18. The State also noted "multicultural concepts and practices" in the KCMSD schools, including "professional development workshops on non-biased practices [and] equity awareness," "specific units of instruction related to equity topics or equity representation," "written equity criteria related to selection of instructional and LMC resources," [and] "essential and supplemental learning materials reflect social and cultural diversity." *See* KCMSD Exhibit 4 at 26.

While the above observations highlight some of the KCMSD's successful efforts toward elimination of the academic achievement gap, the Court also recognizes that the KCMSD's transition efforts have not always proceeded smoothly. Although the KCMSD filed its Transition Plan in August 1997, the parties continued to negotiate and litigate changes in the District's restructuring plans until April 1998. *See e.g.* Stipulation and Agreement [Doc. # 4698] (April 21, 1998). The KCMSD was deplorably late in developing the professional development, assessment and accountability plans contemplated in its Transition Plan. In fact, the Court frequently had to set and extend deadlines for the submission of those plans. *See e.g.*

Order [Doc. # 4757] (January 11, 1999). The Court noted that the delayed submission of those plans was not the KCMSD's fault alone, but could also be attributed to the unfortunate need to involve many opposing interests as a result of this case. *Id.*

Other examples of the KCMSD's intermittent transitional progress can be found in DESE's Final Report from its 1999 MSIP Review. DESE observed that "[s]cope and sequence sections identified in the Core Curriculum guides were very abbreviated and consisted primarily of content strands.... Assessments and instructional strategies ... were not included in the written curriculum guides.... teachers' curriculum guides do not include [the Show–Me] cross references." *See* KCMSD Exhibit 4 at 16. This observation clearly pertains to the District's implementation of the Core Curriculum. DESE also observed that "dissemination of building test results varies widely within the district" and "that the degree to which current technology is available and is integrated with instruction varies widely among buildings in the district." *Id.* at 27. This observation pertains to the KCMSD's implementation of uniform instructional practices for student achievement.

While it is clear that the KCMSD's transitional progress has been inconsistent, the DMC has reported to the Court that much of the KCMSD's faltering can be attributed to the absence of talented personnel in the District. In its October 14, 1998 report, the DMC presented a number of areas within the KCMSD that, in the DMC's opinion, "have impeded the implementation of the Court ordered goal in regards to academic achievement." *See* DMC Report to the Court at 3 (October 14, 1998). The DMC report focused primarily on the lack of "administrative talent" within the KCMSD. *See id.* at 5. The DMC noted that Superintendent of Schools Henry Williams, who left the District shortly after the DMC's report, had a "cultural deficit perspective" that fostered

low expectations for urban students. *Id.* at 7. The DMC observed that "the KCMSD did not appear to have the necessary leadership to produce a [professional staff development] plan that has been agreed to by all the parties." *Id.* at 10. The DMC's report also set out a number of examples of ineffective "decision-making by the Superintendent and his staff [that] has been shortsighted and reactive in nature." *Id.* at 12–19.

The DMC's April 15, 1999 Report to the Court voiced many of the same concerns. The DMC stated its general belief that the "lack of progress made by the KCMSD is related to the lack of adequate talent to secure results." *See* DMC Report to the Court at 1 (April 15, 1999). The DMC noted the KCMSD's deficiencies in recruiting teachers for the 1998–99 school year and that the KCMSD was doing only slightly better in recruiting for 1999–2000. *Id.* at 5. The DMC reiterated its belief "that the selection of personnel is the future of the KCMSD," *id.* at 9, and that "even the best articulated plans, including a professional development plan, will not save the KCMSD without talented personnel to carry them out." *Id.* at 12. DESE's observations support those of the DMC:

> "The instability of top-level administrative positions, the frequent movement of building administrators, frequent program changes, and a lack of clarity about student performance expectations contribute to the district's inability to realize high student achievement. A concern related to the high turnover of central office and building administrators and the effect these turnovers have on the continuity of district programs was cited in the district's first-cycle MSIP report."

*See* KCMSD Exhibit 4 at 16.

The KCMSD has recently turned a corner on its personnel problems. After a long but successful search, the KCMSD hired a new Superintendent of Schools on July 19, 1999. Having been identified as a highly qualified candidate by the DMC and thoroughly investigated by the Board of Education, Benjamin Demps Jr. offers the kind of intellectual capacity, administrative background, personal integrity, and leadership ability that the KCMSD needs to overcome its administrative problems. Superintendent Demps provides the KCMSD with its best and only chance for changing the District's culture and raising the performance of its students.

Since coming into office on August 1, 1999, Superintendent Demps has proven that he is properly focused, highly motivated, and effective. At a hearing on August 24, 1999, the Superintendent reminded the Court that his focus was on the children of the District—the most essential topic and one that unfortunately is almost never discussed among the "weighted matters" of the courtroom. *See* Transcript at 34 [Doc. # 4784] (August 24, 1999). Demps' presence has already brought successful changes to the District. The KCMSD started the 1999–2000 school year with a lower number of teacher vacancies than it has had in the past five years. *See* Testimony of Benjamin Demps, Transcript at 192 (November 1, 1999). Although Superintendent Demps credits hard-working staff that would only accept quality applicants, *id.*, there is no doubt that his presence in the KCMSD has motivated existing personnel to new levels.

In addition to the renewed spirit and motivation that Superintendent Demps brings to the KCMSD, Demps has hired dedicated and hard-working personnel to assist him in lifting the KCMSD out of its woes. Superintendent Demps' Chief of Staff greatly impressed the Court with her knowledge and passion for improvement in the District. Ms. Cheryl Lynn Shannon has worked six and seven days a week since coming to the KCMSD, often for ten and twelve hours a day. *See* Testimony of Benjamin Demps, Transcript at 194 (November 1, 1999). She has covered operations in the KCMSD's Human Resources Department in the absence of an HR Director, facilitated professional development

in the absence of a professional development director, and managed the District's curriculum and instruction department in the absence of a deputy superintendent. *See* Testimony of Cheryl Shannon, Transcript at 64–65 (November 1, 1999). The DMC has noted that Superintendent Demps and Ms. Shannon have been "moving forward to implement the core curriculum, classroom practices, professional development, accountability, and assessment [components of the Transition Plan]." *See* DMC Report to the Court at 2 (October 22, 1999). While the KCMSD obviously needs more competent people to follow the lead of Superintendent Demps and Ms. Shannon, the Court is convinced that their leadership will help move the District to higher levels of performance and achievement.

The DMC also has pointed to problems with the School Board for the KCMSD to explain some of the District's slow progress toward unitary status. In its April 1999 Report to the Court, the DMC noted that "a clear set of the Board's goals has not been forthcoming." *Id.* at 9. The DMC also observed "that it is unclear whether the Board as a unit believes that personnel recruitment and/or employment of personnel, including the Superintendent, should be its number one priority." *Id.* at 12. The DMC expressed its concern that "the Board and the KCMSD are often driven by public relations and not a careful review of the data, facts, and evidence." *Id.* at 15. The DMC's most recent report to the Court focused on inappropriate interference by the Board with Superintendent Demps' administration of the District. *See* DMC Report to the Court (October 22, 1999).

Actions by the School Board have long been a concern for the Court and a problem in this case. In March 1997, the Court noted that "[a]lready low achievement scores have fallen in the last year or two and the debacles of the School Board have provided near constant fodder for the news media." *See Jenkins,* 959 F.Supp. 1151, 1178 (W.D.Mo.1997). Less than one month later, on April 17, 1997, Dr. Bartman, Commissioner of Education for the State of Missouri, testified that the

> [t]he history of this, the Board of Education in the Kansas City District has a history of politics before students. I believe that they have taken their eye off the student along the way and have not tended to the business of policy. I think, frankly, that the methodology that they elect boards in the Kansas City area is one which lends itself more to that kind of activity than in other district in the state, where they elect all board members at large. This Board is relatively new as a board ... and whether they can rise above the politics that has, in my judgment, guided the District's decision-making over the last many years has [sic], I think, part of the jury is out on that particular issue.

*See* Testimony of Dr. Robert Bartman, Transcript at 89–90 [Doc. # 4497] (April 17, 1997). While the DMC's Reports to the Court have confirmed that the "relatively new Board" still places politics before students, the Court believes that this political influence is weakening. DESE's most recent findings support the Court's observation:

> Interviews indicate that many staff members feel the Board of Education members have an improved understanding of their role as policymakers and are exercising more restraint in becoming involved in administrative duties; however, these same staff members believe more improvement is needed in this area.

*See* KCMSD Exhibit 4 at 60.

Having reviewed the background and essential facts outlined above, the Court can proceed to the merits of the KCMSD's pending motion.

**B. Discussion**

█ The KCMSD has moved this Court for an Order declaring void *ab initio* the State's Board's decision to designate the District as unaccredited. The KCMSD's motion seeks an extraordinary equitable

remedy. "Although the remedial powers of an equity court must be adequate to the task, they are not unlimited, and one of the most important considerations governing the exercise of equitable power is a proper respect for the integrity and function of local government institutions." *See Missouri v. Jenkins*, 495 U.S. 33, 51, 110 S.Ct. 1651, 1663, 109 L.Ed.2d 31 (1990) (*Jenkins II* ) (internal quotations and citations omitted). Before attempting to exercise such broad remedial power, the Court must assure itself that the relief sought is absolutely necessary, and that no permissible alternative is available. *See e.g. id.*

This case has had its share of extraordinary equitable remedies. In 1986, the Court ordered the implementation of an ambitious desegregation plan that far exceeded the scope of its remedial powers. *Jenkins III*, 515 U.S. 70, 94, 115 S.Ct. 2038, 2052, 132 L.Ed.2d 63 (1995). In 1987, the Court imposed a tax increase to pay for its remedial plan, *Jenkins*, 672 F.Supp. 400, 412 (W.D.Mo.1987), once again exceeding the scope of its constitutional authority. *See Jenkins II*, 495 U.S. at 52, 110 S.Ct. at 1663. The Court's previous exercises of its "broad" equitable power have led this case to the United States Supreme Court two out of three times. Meanwhile, the Court-ordered desegregation plan has cost the State and the KCMSD over $2 billion. *See e.g. Jenkins*, 959 F.Supp. 1151, 1154 (W.D.Mo.1997).

Despite the expenditure of vast sums, the prolonged oversight of a federal court and its appointees, the efforts of multiple parties, and the passage of forty years since the end of official, *de jure* segregation in Kansas City, Missouri, the KCMSD still struggles to provide an adequate education to its pupils. As was said in another context, "[t]he very complexity of the problems of ... managing a ... public school system suggests that 'there will be more than one constitutionally permissible method of solving them,' and that ... 'the legislature's efforts to tackle the problems' should be entitled to respect." *San Antonio Independent Sch. Dist. v. Rodriguez*, 411 U.S. 1, 42, 93 S.Ct. 1278, 1301, 36 L.Ed.2d 16 (1973) (quoting *Jefferson v. Hackney*, 406 U.S. 535, 546–47, 92 S.Ct. 1724, 1731–32, 32 L.Ed.2d 285 (1972)). No person involved in this case can deny the complexity of urban education. Neither the Court nor the current parties to this case have "cornered the market" on urban education policy. The State Board's accreditation decision reflects conscious, race-neutral policy choices made by the state legislature and by state education experts at DESE. These policy choices are entitled to respect. As Plaintiffs' counsel Arthur Benson noted in April 1997:

> the Department of Elementary and Secondary Education ... has a vision, and it uses that word, it has a vision, about how education should most effectively be organized so that teaching and learning can occur in school, so that all children can learn to high standards. And by high standards, we mean minimums. The phrase "high standards" means raising the hurdle over which all children should be able to jump before they finish school. That's a high standards education, in which the minimum education is at a high enough level that we all believe that the graduates are capable of holding a family supporting job, participating meaningfully in democracy, and fulfilling the[ir] responsibilities. DESE has a vision as to how that hurdle should be raised to high standards in a manner in which all kids, every child, can pass over that hurdle. DESE has that vision.

*See* Comments of Arthur Benson, Transcript at 76 (April 17, 1997).

■ While DESE's and the State Board's accreditation process is entitled to respect, "[b]y no means should a district court grant [state or] local government[s] carte blanche." *see Jenkins II*, 495 U.S. at 52, 110 S.Ct. at 1663 (citing *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971)). "[I]f a state-imposed limitation on a school authority's discretion operates to inhibit or obstruct the operation of a uni-

tary school system or impede the disestablishing of a dual school system, it must fall; state policy must give way when it operates to hinder vindication of federal constitutional guarantees." *North Carolina Bd. of Educ. v. Swann,* 402 U.S. 43, 45, 91 S.Ct. 1284, 1286, 28 L.Ed.2d 586 (1971). The instant case, however, does not present such a situation.

■ The standards used by DESE and the State Board to determine that the KCMSD should be designated as unaccredited do not conflict with this Court's remedial orders. In fact, the two are fully consistent with each other. Just as DESE requires a "Comprehensive School Improvement Plan" to "guide the district in decision-making about the Resource and Process Standards that should lead to higher student performance," the Court has sought a "comprehensive, integrated educational and instructional plan," and required the KCMSD to develop a "long-range plan" of the same nature. *Compare* Standards and Indicators Manual at 3, *with Jenkins,* 959 F.Supp. at 1173, *and* Order at 2 [Doc. # 4378] (October 23, 1998). Where DESE suggested the need for a "single, districtwide school improvement plan with measurable performance objectives which guides the overall improvement of student performance," the Court's long-range planning requirements included a "list of concrete objectives that conform to the KCMSD's educational philosophy [and a] cohesive strategy for achieving those objectives that links curriculum, instruction, staff development, personnel and student assessment, and accountability." *Compare* State's Exhibit 3, "Technical Assistance Report" at 48 (January 28, 1998), *with* Order at 2 [Doc. # 4378] (October 23, 1998).

The Court's directive that the KCMSD fully implement its core curriculum as reflected in instructional practices is fully consistent with DESE's curriculum standards. *See* Standards and Indicators Manual, § 6 at 9–10. Similarly, the court-ordered focus on effective instruction, professional staff development, assessment, and accountability is mirrored in most of DESE's process standards. *See id.,* §§ 7–12 at 10–21. Of particular relevance is DESE's requirement that the School Board for the KCMSD must annually review performance data based on race/ethnicity to effectively monitor student progress and, if significant differences exist among various racial and ethnic groups, the District must use this information to adjust its curriculum and instructional programs. *See id.,* § 7.2 at 11. The KCMSD's Professional Development Plan satisfies both the Court's requirements and DESE's professional development requirements. *See id.,* § 12.1(3) at 20. Likewise, the KCMSD's Assessment Plan closely follows MSIP guidelines. *See id.,* § 7.2 at 11.

Looking at the MSIP performance standards, the Court finds similar correlations to the desegregation remedy. Even during this transition phase since 1997, the Court, DMC, and parties have focused on improving the general academic achievement of the District. DESE's performance standards measure just that—student academic achievement. The MSIP review process analyzes student achievement in Math, Communication Arts, and Science (performance indicators for Social Studies may become available at a later date). Student achievement in these areas is equally important to the Court's review of the academic achievement gap.[3] A narrow view of student academic achievement might exclude assessments of career preparation, vocational education,

---

**3.** The only difference lies in the assessment tool. Whereas the Court placed significance in 1997 on the Iowa Test of Basic Skills ("ITBS"), the State has developed an assessment program, the MAP, that more closely measures student learning than the older, strictly norm-referenced ITBS. The ITBS only retains its significance because of the Court's involvement. MAP scores, on the other hand, will better assist the KCMSD in realigning its curriculum and instruction to identified weaknesses, making it much more valuable as a tool for improving student performance.

and educational persistence. The Court is not inclined to adopt such a narrow view, however, and believes, as the State Board evidently does, that all of these indicators tie closely together. The Court believes that if the KCMSD improved its ability to keep its students in school on a daily basis, those students' overall academic achievement also would improve. *Cf.* Testimony of Marilou Joyner, Transcript at 283 (November 1, 1999). Similarly, the Court believes that increased reading achievement through more effective instruction would enhance students' career preparation and educational persistence. *Cf. id.* Most importantly, the Court believes that compliance with MSIP guidelines will help eliminate the 2.6–NCE academic achievement gap. *Cf. id.* at 283–84.

Not only are the State Board's accreditation standards fully consistent with the Court's remedial orders, the State Board's decision to designate the KCMSD as unaccredited is also consistent with the Court's (and parties') desegregation efforts. The very purpose of the State Board's accreditation process is to infuse accountability into its school districts' educational efforts. *See* Testimony of Marilou Joyner, Transcript at 251 (November 1, 1999). National education experts advocate the use of accountability at all levels to improve educational performance. *See e.g.* John M. Goff, *A More Comprehensive Accountability Model,* Council for Basic Education (visited October 26, 1996) < htt p://www.c-b-e.org/articles/goff.htm > ("The individual school as the focal point of accountability is as it should be. This is where the 'rubber meets the road' in the delivery of education to our nation's children. To make such demands however, when key stakeholders, including local board members, parents, superintendents and district staff, state agency staff, state board members, teacher preparation institutions, and other policy makers are not carrying out their responsibilities creates conditions that are neither fair nor reasonable."). Plaintiffs' counsel has specifically advocated for the infusion of accountability in the KCMSD:

No systemic process exists by which poor and mediocre teachers are weeded out, because the school district doesn't have any idea what its measuring them against, because it has no vision and no criteria, and therefore, no reason judgments are made on the decisions that must be made.... And the same thing applies to programs, which programs to retain and which programs to cut....

*See* Comments of Arthur Benson, Transcript at 78–79 (April 17, 1997). Likewise, the Court and DMC have demanded real accountability in the KCMSD as a practicable and necessary step toward unitary status. *See e.g.* Order at 2 [Doc. # 4772] (June 17, 1999) (naming implementation of accountability plan as a "practicable step" toward unitary status); Order at 2 [Doc. # 4738] (October 23, 1998) (requiring development of an "effective program for assessment and accountability"); Order [Doc. # 4735] (October 14, 1998) (approving School Board's decision to buy out former Superintendent's contract because his administration was not performing and was disruptive to the KCMSD's progress).

In fact, the KCMSD Transition Plan identified the absence of "real accountability at all levels" as one of the primary factors contributing to the "perpetuation of the achievement gap between black and white students in the KCMSD." *See* Transition Plan at 16–17. When the KCMSD submitted its Accountability Plan this past Spring, the KCMSD stated:

Public schools are only going to stay in business if they are able to prove that they can teach the children in their charge to read, write, and compute at high levels. Bottom line, they must produce and showcase quantifiable results on tests and other achievement indicators. Making test results and other academic data the central piece of the school accountability tool will help to answer the following questions: What have students learned as a consequence of going to school? Are the schools in the district improving? Are students

prepared for entry after graduation into post-secondary education institutions; the military; and/or the job market? Are they prepared with the skills to allow them to make choices that impact the quality of their lives?

Performance indicators, or outputs, are more difficult to measure than school inputs, but they are valid indicators of progress. No indicator system could accommodate all of the potentially important indicators of valid educational processes and still remain manageable. The indicators chosen were consistent with those identified as important in the Research and/or by the State of Missouri.

See KCMSD Motion for Approval of Plans [Doc. # 4761], Exhibit A, "Accountability Plan" (January 29, 1999); KCMSD Updated Accountability Plan [Doc. # 4765] (April 15, 1999). Not only did the KCMSD rely on MSIP performance indicators to develop its court-ordered accountability plan, therefore, the District also acknowledged its responsibility to educate students or be put out of business.

The State Board's accreditation decision holds the KCMSD accountable for its educational failures. The KCMSD has previously praised the need for such accountability. The Court believes that an Order declaring the State Board's decision void would simply allow the KCMSD to avoid being held accountable and further shirk its educational responsibilities to the State of Missouri and the children of Kansas City. Such an Order would not, on the other hand, further the constitutional standards of a desegregated, equal education.

While the negative consequences of an unaccredited designation, both direct and indirect, may indeed be real, they can be attributed to the State Board's decision only to the extent that decision increases the District's problems. The KCMSD fears that its unaccredited status will motivate student flight to charter schools. A student's decision to leave the District for a charter school is more likely to be motivated, however, by his or her realization that the KCMSD is not, in fact, providing the education needed. The potential that students would come to this conclusion existed long before the State Board voted to designate the KCMSD as unaccredited. *See e.g.* Testimony of Dr. John Murphy, Transcript at 31 (November 1, 1999) ("If you have to be awakened in Kansas City to the fact that students aren't performing, you have been completely under a rock for the last five years."). Similar reasoning applies to fears about the potential flight of qualified teachers and administrators. The Court does not believe that the State Board's accreditation decision is any more likely to inhibit the KCMSD's recruiting potential. Working in the KCMSD, regardless of its unaccredited status, presents a major challenge that will either attract or repel education professionals.

In sum, the Court believes the State Board's decision to designate the KCMSD as unaccredited is: (1) based on standards that are fully consistent with the Court's desegregation orders; (2) an attempt to infuse accountability in the KCMSD that is fully consistent with the Court's desegregation orders; and (3) unlikely to engender the high degree of negative consequences that could prevent compliance with the United States Constitution. For all of these reasons, the State Board's decision is entitled to respect and the Court will not declare that decision void.

## IV. MODIFICATION OF THE COURT'S DESEGREGATION ORDERS

■ The foregoing discussion has raised serious questions for the Court about the efficacy of continued judicial control over the KCMSD. The KCMSD is entering its twenty-third year of Court supervision; during fifteen of those years, the Court has directed the KCMSD's remedial efforts. The KCMSD has consistently complied in good-faith with the Court's desegregation orders. *See e.g. Jenkins III,* 515 U.S. 70, 89, 115 S.Ct. 2038, 2049, 132 L.Ed.2d 63 (1995). Furthermore, the

KCMSD has expended great energy on the Court's remedial orders. Given its long history of administrative problems, the KCMSD has attempted in every way practicable to eliminate the vestiges of prior segregation.

The KCMSD has successfully established a stable and practicable racial balance in light of its concentrated minority student population. The capital improvement program ordered by the Court prior to 1997 has been substantially and practicably completed. The KCMSD has also significantly modified its accounting practices so that it could reconcile actual expenditures to budgeted amounts. The KCMSD has developed quality instructional plans, including a new Core Curriculum, a professional development plan, and assessment and accountability plans. Although the KCMSD's development of these plans came late in the day, the Court, the DMC, and DESE have all noted that the District's administration is now making substantial progress implementing these plans.

While the KCMSD's transition progress in implementing the Court's remedial directives has often been slow and intermittent, the KCMSD has faced significant hurdles during its transition phase. A major, but necessary, budget reduction, a poorly-qualified and unstable administration, and an overly political Board have all impeded the KCMSD's progress. Administrative difficulties and non-discriminatory political influences in local policy are not constitutional violations, however. Nor can the Court consider these "hurdles" to be vestiges of prior segregation. In fact, the Court has already concluded that prior segregation did not result in other, similar deficiencies, such as the previous "lack of a core curriculum [and] uneven quality of teachers." *Jenkins,* 959 F.Supp. at 1163. Thus, even though administrative efficiencies and a non-politicized focus on education may constitute "the building blocks of a good school system, which admittedly, the KCMSD is not," these "deficiencies relate only peripherally" to the KCMSD's remedial targets.

The KCMSD has not only had to overcome internal difficulties, it has also faced external problems resulting directly from this case. The parties and the DMC have mired the KCMSD's educational policies in repeated litigation when such policy decisions would normally fall within the KCMSD's exclusive domain. *See e.g.* AFT Objection to DMC Recommendation [Doc. # 4776] (July 26, 1999) (objecting to reconstitution of KCMSD schools); Order [Doc. # 4780] (August 12, 1999)(requiring answers to certain questions); Order [Doc. # 4782] (August 26, 1999)(denying AFT objection and ordering KCMSD to show cause why DMC recommendation should not be adopted as Court Order); KCMSD Objection to DMC Recommendation [Doc. # 4786] (September 24, 1999) (regarding placement of middle school teachers); KCMSD Objection to DMC Recommendation [Doc. # 4789] (October 8, 1999) (regarding Internal Auditor position). The Court understands that the District's poor track record of making (or not making) such decisions has led to the necessary involvement of other actors. Indeed, the Court asked its DMC to be closely involved in the KCMSD's day-to-day operations. *See* Order [Doc. # 4580] (August 21, 1997). Without the DMC's involvement, the KCMSD may not have succeeded to the extent that it has, and the DMC should be praised for its actions and decisions. The Court also believes, however, that repeated litigation over the KCMSD's educational policy has slowed the District's progress.

A secondary consequence of the repeated litigiousness spawned by this case is the KCMSD's need to set-aside large sums of money to pay its attorney's fees and litigation costs. Moreover, continued Court oversight has warped the KCMSD's lines of communication such that its general counsel reports directly to the School Board rather than to the Superintendent. *See* DMC Report to the Court at 12–13 (October 22, 1999). This dual system of communicating with the School Board not only violates state standards for school district operation, they also circumvent the

Superintendent's ability to control the decision-making and direction of the administration. *Compare* 5 C.S.R. 50–340.010(2)(C) (1998), *with* DMC Report to the Court at 13 (October 22, 1999). This case also has forced KCMSD personnel to operate under multiple chains of authority, including the Court, the DMC, the School Board, the Superintendent, the KCMSD's attorneys, the Plaintiffs' counsel, and the AFT. All of these entities, including the Court, have helped to pull the KCMSD away from its primary focus—educating children. It is also possible, even likely, that the large number of chefs in the KCMSD's kitchen has contributed to its administrative instability, leading some of the District's past administrators and Superintendents to leave the KCMSD rather than be endlessly prodded in different directions. Certainly, the Court's oversight of the KCMSD and School Board has led to intensified media scrutiny and politicization of administrative and educational issues, further damaging the District's ability to focus and progress.

These by-products of Court oversight suggest that retention of judicial control may be more disruptive than beneficial to the KCMSD. The Court is drawn even closer to this conclusion by the fact that the KCMSD and the Kansas City community have repeatedly used the Court's presence as a shield from responsibility. In 1997, the Court's continued oversight served to protect the KCMSD from having its tax levy reduced from the court-ordered amount of $4.96 to the state-ordered

minimum of $2.75. *See Jenkins,* 959 F.Supp. at 1154. Taxpayers of Kansas City had not approved a tax levy increase since 1969. *Id.* at 1169. After 1986, the Court's presence obviated any need for local leaders to seek such a difficult vote. Although the KCMSD's tax levy financing no longer appears to be a problem, *see Jenkins,* 158 F.3d 984, 985 (8th Cir.1998)[4], Superintendents and School Board members have continued to use the Court as a shield from responsibility, placing blame on the Court and DMC for the KCMSD's inability to make particular reforms. *See e.g.* Phillip O'Connor, *Judge Rebukes School Board: Quit politicking, he tells members,* K.C. Star, June 16, 1999, at A1 (" 'You can't give the DMC operational, day-to-day control and excuse them when things don't go right,' said board member Lance Loewenstein. 'Either the DMC is responsible, or they're [sic] not.' "). In essence, District leaders have attempted to avoid accountability by hiding under the Court's oversight. The KCMSD has once again sought to shield itself behind the Court—this time, from the State's accreditation process. The Court believes that the KCMSD's ability to use the Court as a shield from responsibility and accountability negatively impacts its motivation to take the actions necessary to be an effective school district.

From the above analysis, the Court believes the time has come to modify its prior desegregation orders and grant the KCMSD complete relief from further liability under those orders.[5] Informing the

---

4. A state constitutional amendment now authorizes the School Board for the KCMSD to set its tax levy as high as $4.95 without voter approval. *See* H.J.R. 9, 89th Gen. Assembly (Mo.1997) (approved by voters April 7, 1998) (amending Mo. Const. Art. 10 § 11(g)).

5. The Court has the "inherent capacity to adjust [its] remedies" and "vacate or modify its injunctions." *See Jenkins,* 122 F.3d 588, 600–01 (8th Cir.1997) (quoting *Freeman v. Pitts,* 503 U.S. 467, 487, 489, 112 S.Ct. 1430, 1444, 1445, 118 L.Ed.2d 108 (1992) and *Booker v. Special School Dist. No. 1,* 585 F.2d 347, 352 (8th Cir.1978), *cert. denied,* 443 U.S. 915, 99 S.Ct. 3106, 61 L.Ed.2d 878 (1979)).

This is especially true in a school desegregation case, where "equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs." *Milliken v. Bradley,* 433 U.S. 267, 288, 97 S.Ct. 2749, 2761, 53 L.Ed.2d 745 (1977) (quoting *Brown v. Board of Educ.,* 349 U.S. 294, 300, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955)). Moreover, the Court bears the primary responsibility for exercising its discretion in determining "whether and to what extent an injunction should be modified." *See Jenkins,* 122 F.3d 588, 601 (8th Cir.1997) (citing *Booker,* 585 F.2d at 353).

Court's decision to exercise its discretion at this time are the following factors: The KCMSD has made significant progress toward eliminating the academic achievement gap and is on track to continue its progress. The District has a valuable new leader and well-conceived instructional plans to guide its way. It has consistently complied in good-faith with the Court's remedial orders since they were entered, and it is currently operating in compliance with the Constitution. Considering the obstacles that the KCMSD has faced in the form of administrative incompetence, instability, repeated litigiousness, warped lines of authority and communication, and major budget reductions necessitated by a scaled-back remedial plan, the Court concludes that the KCMSD has eliminated the vestiges of prior segregation to the extent practicable.

Also weighing heavily in the Court's decision is its belief that judicial supervision is more likely to impede the KCMSD's progress than motivate it, especially considering the degree of consistency between the State's accreditation standards and constitutional requirements. Where the Court's continued oversight was previously necessary to hold the KCMSD's feet to the fire, such supervision is no longer so important. The KCMSD must remain focused on its current path if it has any hope of regaining accreditation. If the KCMSD fails to continue its focus on professional development, curriculum implementation, methodically targeting assessments toward improved academic achievement, and keeping its students in school, it will most certainly fail to regain accreditation and its corporate charter will lapse. This fear alone should motivate the District and community. Court oversight, then, is unnecessary to keep the KCMSD on track.

Finally, the Court notes the peculiarity of the KCMSD's current situation. The Court's desegregation orders are only intended to enforce constitutional guarantees of an equal education; they do not and cannot make a high standards education the primary focus of this case. By contrast, the State Board's accreditation standards are intended to ensure high educational standards and a quality education for Missouri schoolchildren. Despite this important difference in purpose, the KCMSD's transition principles and remedial targets are virtually identical to the State Board's resource and process standards for state accreditation purposes. The United States Constitution does not set academic standards for education. The founding fathers left this realm to the various states, and no amendment has yet changed this balance of educational authority. Consequently, absent some further direction from the Supreme Court or a new constitutional amendment, it is incumbent on this Court to ensure that the Fourteenth Amendment not become so corrupted as to guarantee general educational standards that it was never meant to ensure. The sole question in this case is whether the KCMSD is currently providing an equal education to its students, regardless of their race. The Court must answer this question in the affirmative.

The KCMSD is not in any way segregating its students or otherwise discriminating on the basis of race; it has not done so for many years. In contrast, the District has made every practicable effort to eliminate the lingering vestiges of prior segregation. Asking any more, even in the face of the KCMSD's obvious educational deficiencies, would unnecessarily intrude upon the "interests of state and local authorities in managing their own affairs consistent with the Constitution." *Jenkins III*, 515 U.S. at 98, 115 S.Ct. at 2054 (quoting *Milliken v. Bradley*, 433 U.S. 267, 280–81, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745 (1977)). Consequently, the Court believes that modification of its remedial orders is necessary to "restore state and local authorities to the control of a school system that is operating in compliance with the Constitution." *Jenkins III*, 515 U.S. at 102, 115 S.Ct. at 2056.

## V. CONCLUSION

For the foregoing reasons, the Court DENIES the KCMSD's motion for equita-

ble relief. The Court will not rejoin the former State Defendants as parties in this case or declare the State Board's accreditation decision void *ab initio.* Furthermore, it is

ORDERED that the Kansas City Missouri School District, the Kansas City Missouri Board of Education, and the Superintendent of Schools are hereby relieved from further liability under the Court's desegregation orders. This case is dismissed with prejudice, subject to Court resolution of pending motions and future motions for costs and fees related to this litigation. To facilitate the Court's exit from this case, the Court will ORDER that its DMC remain in place, consistent with the Court's Order of August 21, 1997, until the parties resolve all issues raised by this Order, including a potential appeal, or until March 27, 2000, whichever comes earlier.

IT IS SO ORDERED.