BEAM, Circuit Judge,
with whom BOWMAN and LOKEN, Circuit Judges, join,
dissenting.
After twenty-three years of federal court supervision, the educational program of the Kansas City Missouri School District (KCMSD) is in shambles. Its students remain as racially isolated as when the first remedial order was entered by the district court on June 14, 1985.[11] Student scores as measured by routine and regularly administered standardized tests have remained static or have declined,[12] and this has occurred even though over two-billion tax dollars have been spent since 1985 on the remedial plan alone, with total educational spending averaging more than $9,000 per student per year (in addition to millions of dollars in capital expenditures). I am confident that this average per pupil amount is well above that spent by any other school district in Missouri for the same period.[13] Until 1996, attorneys for the Jenkins class freely roamed the classrooms, hallways and playgrounds monitoring, observing, talking and projecting themselves into the work and educational lives of school principals, faculty, staff and students. Appellants’ brief at 5. Until very recently, a Desegregation Monitoring Committee under the direct control of the district court involved itself in the day-to-day activities of the school system. Joint Appendix at 1109-11. Unremark-ably, the Office of Superintendent of Schools, the supposed chief executive of the school system, has been a revolving door and once the office was empty for a significant period of time. Jenkins v. Missouri, 959 F.Supp. 1151, 1178 (W.D.Mo.1997) (Jenkins VIII), aff'd, 122 F.3d 588 (8th Cir.1997) (Jenkins XIV); Jenkins v. School Dist. of Kansas City, 73 F.Supp.2d 1058, 1072 (W.D.Mo.1999) (Jenkins X). Finally, the State has now designated the KCMSD as unaccredited.
As regrettable and tragic as this situation is, none of the parts in this parade of *734 problems rises to the level of past or present invidious discrimination remediable by a federal court. In short, a school district in shambles is not a constitutional violation.[14]
*735 So after fifteen years, we are called upon to decide only one issue-whether the district court was correct in dismissing this costly and seemingly endless case without holding an evidentiary hearing.[15]
I agree with Judge Loken that in 1997 both the district court and this court violated the Supreme Court’s mandate in Jenkins III by shifting the burden of proof on the issue of whether an achievement gap is a vestige of a de jure segregated school system. I write separately only to emphasize that even if such an achievement gap can be correctly viewed as a vestige of prior discrimination, the district court had more than sufficient evidence in the record to rule that KCMSD had shouldered its burden of showing that it had eliminated the gap to the extent practicable. This entitled KCMSD to a determination of unitary status.
Unitary status (and final relief from court control) is achieved when the vestiges of prior discrimination have been eliminated “to the extent practicable.” Missouri v. Jenkins, 515 U.S. 70, 102, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995) (Jenkins III) (emphasis mine). The class now concedes that the only remaining vestige in this case, if any, lies within a portion of a black-white educational achievement gap that exists among the students of KCMSD. This theory was conceived by Dr. William Trent and adopted by the district court in Jenkins VIII after a three-week-long hearing held to determine, in part, the State’s motion for unitary status of KCMSD. 959 F.Supp. at 1158.
As a threshold matter, I note that any evidence that such a vestige exists in KCMSD is dubious at best. Even a cursory examination of the bases for Dr. Trent’s opinions reveal them to be nothing more than guesses and speculation. This court’s reliance on a black-white achievement gap to measure lingering effects of invidious segregation runs contrary to the finding of every other Circuit Court that has considered the issue. See United States v. City of Yonkers, 197 F.3d 41, 54-55 (2d Cir.1999); People Who Care v. Rockford Bd. of Educ., 111 F.3d 528, 537-38 (7th Cir.1997); Coalition to Save Our Children v. State Bd. of Educ., 90 F.3d 752, 776-77 (3d Cir.1996). In fact, Dr. Trent’s testimony on this purported phenomenon was rejected by the First Circuit. See Wessmann v. Gittens, 160 F.3d 790, 804 (1st Cir.1998). Similar evidence based upon Dr. Trent’s *736 methodology was held inadmissible under Daubert standards by the Seventh Circuit. See People Who Care, 111 F.3d at 537. Nonetheless, this court clings to the claimed existence of such a vestige of discrimination.[16]
Contrary to the court’s position in Jenkins v. Missouri, 122 F.3d 588 (8th Cir.1997), Jenkins III does not authorize a purported achievement gap as a vestige. Although not an exhaustive list of the vestiges of discrimination, student achievement is not among the six factors[17] required for unitary status under Green v. County School Bd. of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). In fact, raising a red flag on the problematic nature of an achievement gap *737 as a factor, the Supreme Court noted that many “demographic changes independent” of de jure segregation could contribute to a gap. Jenkins III, 515 U.S. at 102, 115 S.Ct. 2038. The Court stated “insistence upon academic goals unrelated to the effects of legal segregation unwarrantably postpones the day when the KCMSD will be able to operate on its own.” Id.
The frailty of an achievement gap as a vestige is dramatized by the testimony of two of the educational experts heard at the January 1997 unitary status hearing- — Dr. Trent and Dr. David Armor.[18] Both experts acknowledged that a gap exists nationwide, (Transcript at 1391-92 [Trent]) (Transcript at 437 [Armor]) and Dr. Armor pointed out the gap in Kansas City was lower than the national average gap and lower than the gap in suburban schools surrounding KCMSD. Transcript at 499 & 502-03. Many of the other schools with a similar or greater gap have never been found guilty of race discrimination of any sort. Id at 502-03. Indeed, this court has determined the suburban Kansas City Schools were discrimination free. See generally Jenkins v. Missouri, 807 F.2d 657 (8th Cir.1986) (en banc).
Assuming, for the sake of discussion, that the achievement gap is a vestige of discrimination, I turn to the unsupportable position of the class and the court on how to narrow the gap. KCMSD has identified five areas that supposedly contribute to low achievement by its minority students. These areas are (1) expectations by teachers; (2) lack of a core curriculum; (3) ineffective staff development; (4) lack of a comprehensive assessment system; and (5) the absence of accountability at all levels. KCMSD created, and had the court approve, five plans to address these factors (classroom practices, professional development, assessment, accountability, and curriculum). Each of these plans is now purportedly at a different stage of its implementation, ranging from nearly complete to barely underway.[19] All parties *738 concede that some of the plans can never be fully implemented because the idea of what “good” educational practices are is always evolving. The class also concedes the remaining obstacle to unitary status is the implementation of the plans to a “satisfactory” level, whatever that may be. However, there is a more fundamental problem.
The undisputed evidence offered at the 1997 hearing shows that non-minority and minority students respond equally to effective teaching and innovative educational techniques.[20] Transcript at 1411-12 (Trent), Transcript at 498 (Armor) and Transcript at 271 (Dr. Christine Rossell). The implemented and to-be-implemented programs at KCMSD will, according to the testimony, raise the test scores of all KCMSD students without regard to race. This laudable and sought after educational result occurs because,' as the Supreme Court noted in Jenkins III, a “rising tide lifts all boats.” Jenkins III, 515 U.S. at 102, 115 S.Ct. 2038. In other words, under the current plan all KCMSD students will improve at the same rate in normalized curve equivalents (NCEs). Clearly then, the evidence shows that the presently approved court educational plan, by itself, will not impact the achievement gap. Without influence from factors well beyond the control of KCMSD, the approach now championed by the class and the court will only serve to make the goal unattainable. In short, when the gap is eliminated, if it ever is, it will not be because of federal court supervision of curriculum and classroom instruction. It will be because of societal changes that are not achievable through use of the remedial power and authority of the federal courts.[21]
Accordingly, the proposed use of an achievement gap to measure lingering discrimination is a misconceived idea, and use of it will never allow KCMSD to reach a “satisfactory” level in the eyes of the class and, perhaps, some members of this court. Under this scenario, federal court supervision will continue for, perhaps, another twenty-three years. This, of course, is not *739 a lawful application of the clear mandates of the Supreme Court in Jenkins III.
Even if the plans adopted by the court could conceivably close the achievement gap, KCMSD has fulfilled its constitutional obligations to remedy the discrimination to the extent practicable. Under this contingency, the issue before the court is whether the plans have been implemented satisfactorily. The district court’s November 1-2,1999, hearing and the January 7, 2000, hearing demonstrate that they have been. After the November hearing, the district court found the State’s accreditation process is: “(1) based on standards that are fully consistent with the Court’s desegregation orders; (2) an attempt to infuse accountability in the KCMSD that is fully consistent with the Court’s desegregation orders; and (3) unlikely to engender the high degree of negative consequences that could prevent compliance with the United States Constitution.” Jenkins X, 73 F.Supp.2d at 1077.
These holdings have not been appealed by any of the parties. And, if they have been, they are clearly supported by the record. The court heard testimony from Dr. Marilou Joyner of Missouri’s Department of Elementary and Secondary Education, which is responsible for evaluating the school district and making recommendations about accreditation. Dr. Joyner testified that all five of the court-approved plans conform to state accreditation requirements. Additionally, KCMSD offered evidence and neither the class nor the court has disputed the showing that it was firmly committed to continue with the implementation of the plans approved by the district court as the best way to meet the state standards-a necessary step to avoid eventual implementation of the de-accreditation threat.
In Freeman v. Pitts, 503 U.S. 467, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992), the Supreme Court stated that one of the factors that should inform the court’s discretion in deciding unitary status was “whether retention of judicial control is necessary or practicable to achieve compliance with the decree.” Id. at 491, 112 S.Ct. 1430. Additionally, as we have said in other discrimination cases, when a state takes independent action that will address the court’s remedial concerns, the court should step aside. See Liddell v. Special Sch. Dist., 149 F.3d 862, 870-71 (8th Cir.1998). These findings make it clear the district court’s presence in the litigation is no longer necessary to achieve constitutional objectives and the State has adequately addressed the court’s remaining remedial concerns. As a result, the district court was correct in finding that unitary status had been achieved.
In an effort to dodge or obfuscate the real issues of the case, the class, as earlier indicated, complains that it was a violation of due process and reversible error for the court to dismiss the case without holding a previously contemplated and announced evidentiary hearing.[22] This argument is specious and is not supported by the law of this or any other circuit. At the remedy stage of a school desegregation case, the district court proceeds under its equitable authority, controlling the outcome of the litigation with a series of injunction-like orders. This court, in past opinions in this case, has described the broad and continuing equitable authority of the district court as “ ‘characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs.’ Milliken v. Bradley, 433 U.S. 267, 288, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (quoting Brown v. Board of Educ., 349 U.S. 294, 300, 75 S.Ct. 753, 99 L.Ed. 1083 (1955)).” Jenkins XIV, 122 F.3d at 600; see also Jenkins v. Missouri, 931 F.2d 470, 482 (8th Cir.1991).
Furthermore, an evidentiary hearing was not required, as the district court had all the requisite evidence before it for *740 making a reasoned determination. In particular, a district court may take such action if the court sees that the underlying factual or legal issues have changed. See United States v. Texas, 158 F.3d 299, 312 (5th Cir.1998); Alberti v. Klevenhagen, 46 F.3d 1347, 1366 (5th Cir.1995); United States v. City of Miami, 2 F.3d 1497, 1506 (11th Cir.1993). “ ‘Sound judicial discretion may call for the modification of the terms of an injunctive decree if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen.’ ” Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 380, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992) (quoting Railway Employees v. Wright, 364 U.S. 642, 647, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961)). Such circumstances have obviously arisen in this case.
On October 21, 1999, well after the court’s discussions of a potential January 3, 2000, hearing, a major event changed the nature and scope of this litigation. The Missouri State Board of Education voted to withdraw educational accreditation of KCMSD as of May 1, 2000, and insert itself into the educational picture in Kansas City. As a result of the State’s action, the KCMSD quickly made a motion in the district court to have this action declared void ab initio. The district court responded immediately and held the evi-dentiary hearing of November 1 and 2, 1999.
The State’s appearance through the accreditation process dramatically altered the landscape of the litigation. With court-approved plans and State requirements in accord, one with the other, as earlier noted, every item of evidence necessary to determine unitary status was in place before the district court. Thus, the court’s unitary status holding, based upon the entire record, was clearly correct. An educational gap that purportedly represents a vestige of long eliminated de jure segregation has not been established and even if it has been, with currently approved educational programs, it will not be and, indeed, cannot be mitigated, much less eradicated. The idea that KCMSD has now, after twenty-three years, done everything practicable to “remedy the [earlier] violation to the extent practicable,” is not clearly erroneous-it is clearly correct. For the court to have held otherwise on this record would have been an abuse of discretion.
All current requirements being imposed by this litigation extend well beyond any lawful remedies for violations of distant acts of de jure segregation. And, this case is not about a federal district judge who made a procedural mistake by not holding yet another evidentiary hearing entailing countless thousands of additional taxpayer dollars for court time, staff time, attorney fees and expert witnesses. It is about matters that a federal court no longer has a legitimate right to involve itself in.
It is long past the time to follow the admonition of the Supreme Court in Jenkins III and “‘restore state and local authorities to the control of a school system that is [now] operating in compliance with the Constitution.’ ” 515 U.S. at 101, 115 S.Ct. 2038 (quoting Freeman, 503 U.S. at 489, 112 S.Ct. 1430). “Returning schools to the control of local authorities at the earliest practicable date is essential to restore their true accountability in our governmental system.” Freeman, 503 U.S. at 490, 112 S.Ct. 1430.
The KCMSD is unitary. I would affirm the district court.[23]
*741 [[Image here]]
*742 [[Image here]]
*743 [[Image here]]

. In 1986, the KCMSD had a minority student population of 73.5% with twenty-five schools having greater than 90% minority enrollment. See Jenkins v. School Dist. of Kansas City, Missouri, 73 F.Supp.2d 1058, 1069 (W.D.Mo.1999) (Jenkins X). As of January 1999, KCMSD had a minority student population of 81.8% and twenty-seven schools had greater than 90% minority enrollment. See id. However, because the Supreme Court in Missouri v. Jenkins, 515 U.S. 70, 98, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995) (Jenkins III), eliminated the "desegregative attractiveness” remedial plan, KCMSD could no longer operate its extensive magnet school program nor could it provide transportation for non-resident students. Given wh'at the Supreme Court said it could use as a remedy, and an increase of the minority population of 8.3%, KCMSD has done everything practicable to reduce the racial isolation in the KCMSD and no one has disputed this conclusion in this appeal.

. The KCMSD provided the Iowa Test of Basic Skills scores for every grade level beginning in the 1987-88 school year continuing until at least the 1994-95 school year with the exception of kindergarten. I have placed the earliest and most recent scores in table form, noting the change in average test scores over this period.
The Jenkins class provided the Missouri Assessment Program results. The students are placed in one of five categories, and the percentage of students placed in each category for each of the testing years is noted in table form. Both tables are in the addendum to this opinion.

.The per pupil expenditures (exclusive of amounts for capital improvements) were as follows: 1993-$8,626; 1994-$9,646, 1995-$10,308; 1996-$9,320; and in 1997-$8,688. Joint Appendix at 971 and 1054. In 1999, for instance, KCMSD had a per pupil expenditure of $8,239. See Missouri Department of Elementary and Secondary Education, 1999 School District Report Card, http://www.dese.state.mo.us/reportsummary/ districts/048078.html. In 1999, the average *734 expenditure per pupil in Missouri was $5,925. See id.

. In his concurrence Judge Heaney contends that I paint a "revisionist history” of this litigation. While I sincerely wish that I could revise the history of this troublesome case, I have not done so. I have, instead, accurately reflected the record that was before Judge Whipple and have amply provided citations that support my statements and conclusions.
Judge Heaney discusses the sordid history of slavery in America, a circumstance we all regret, and discusses the unequal and unlawful dual school system that existed in Missouri prior to 1954. These facts, of course, are relevant, if at all, only to the initial matter of unconstitutional segregation, a holding long since determined and ratified and not now at issue in this or any recent appeal.
Judge Heaney also faults the State of Missouri for its alleged failure to embrace his pedagogical and social vision of how the Kansas City school system should have been operated since 1986, a failure of acceptance shared, at least in part, by many school administrators and other local public officials, parents of students of all races and numerous teachers and their collective bargaining representative. However, as the Supreme Court pointedly noted in Jenkins III, most of Judge Heaney's vision falls well outside of the remedial authority of the federal court in this specific litigation or any other similar litigation for that matter. See generally, 515 U.S. 70, 115 S.Ct. 2038, 132 L.Ed.2d 63. Further, since the State was dismissed from this appeal by Judge Whipple's predecessor in 1997, a decision that was affirmed by this court, Judge Heaney's disapproval is directed toward a non-party and, perhaps, this court because it rejected several of his proposals on en banc review many years ago. See Jenkins VIII, 959 F.Supp. 1151, aff'd, 122 F.3d 588; Jenkins v. Missouri, 807 F.2d 657 (8th Cir.1986) (en banc) (Jenkins I). Finally, Judge Heaney expresses disapproval of the actions of the suburban Kansas City schools and refers to "voluntary” programs undertaken in St. Louis. However, his statement underscores an important point-suburban Kansas City school districts, over Judge Heaney’s objection, were specifically found to be free of constitutional violations and were duly dismissed from this litigation. See Jenkins I, 807 F.2d at 672-73. On the other hand, St. Louis suburban schools, under threat of a finding of constitutional complicity by the Court of the Eastern District of Missouri, entered into a settlement agreement, enforceable by the district court, in which a program of state-funded interdistrict transfers were stipulated to and required. See Liddell v. Missouri, 731 F.2d 1294, 1302-09 (8th Cir.1984) (en banc).
Judge Heaney, in footnote 10, questions my taxing and spending figures for the educational operations of the KCMSD. First, he cites single-year figures for the 1998-1999 school year for three affluent suburbs of St. Louis and one small affluent district near Kansas City, while I cite long-term average comparisons for KCMSD and the school districts across Missouri. But, to consider the 1998-1999 school year with Judge Heaney, KCMSD spent $8,239 for school operations, excluding capital improvements, while the surrounding suburban school districts spent an average of $5,834 per pupil. In general, no matter how you manipulate isolated figures, there is simply no doubt that over the last fourteen years, KCMSD has spent substantially more per student per year than any other Missouri school district.
Judge Heaney also seems to misunderstand and, therefore, misapply my discussion of the two billion dollars estimate for the cost of the court’s desegregation plan. He misses the point that the two billion dollars mentioned is for the desegregation plan alone and this amount is above and beyond the usual annual expenses for educational operations of KCMSD. Indeed, excluding capital expenditures, KCMSD has had total operational expenditures of approximately one billion dollars since July 1, 1997, alone. A very recent illustration of Judge Heaney’s erroneous calculations can be found in the record for operational expenditures by KCMSD from July 1, 1997, through June 30, 1999. The two years of expenditures, excluding capital improvements, amounted to $679,196,524, or, $9,426 per student per year and the record establishes that per student costs for earlier years of the desegregation plan have almost always equaled or exceeded these more recent figures. This is, of course, an amount far different from Judge Heaney's fourteen-year unsupported calculation of $3,900 per pupil.
In a similar vein, Judge Heaney takes me to task for my accurate statement that educational test scores have “remained static or have declined” during the life of the desegregation plan. In rebuttal, he cites results from school year 1993-1994. What he does not note is that at the achievement gap hearing in 1997, Dr. William Trent, Judge Clark's preferred expert, noted that some time during the 1994-1995 school year "a new test form” with "different scaling” was used. See Transcript at 1289. Similar evidence is contained elsewhere in the record. I submit that such changes make year-to-year comparisons problematic. However, without dispute, test *735 scores experienced a steady decline from the year cited by Judge Heaney until at least the end of the 1999 school year. In any event, although changes occurred during this period, the beginning and ending figures in my table are absolutely correct as is my conclusion that recurring ITBS, TAP and MAP scores indicate that advances in educational achievement did not occur over time especially in the upper elementary grades and in high school.
Finally, Judge Heaney claims that my conclusions on racial isolation by school are misleading, and points to a short period of time when several schools dropped below a ninety percent minority level, the level above which the term "racial isolation” is definitionally applied. While he is correct for this limited period, he also admits that due to changing neighborhood demographics and other unstated reasons, the number of racially isolated schools (i.e., ninety percent or higher minority population) has now reached the level I set forth in the body of my dissent. And, of course, he doesn’t mention that, in part, this apparent resegregation is a result of a limitation on remedies available to the federal court imposed by the Supreme Court in Jenkins III. Thus, my statement that the Kansas City schools remain as racially segregated today as when the litigation began is accurate.

. The class contends the hearing held on January 7, 2000, was not sufficient because the KCMSD had the burden of proof on unitary status. However, burden of proof is only an issue if the evidence stands in equipoise. Additionally, a party with the burden of proof is, of course, allowed to rest on the record before the court in order to shoulder both its burden of production and persuasion. Further, it is odd that the beneficiary of another party's burden, as the class is here, would have cause to complain, especially since an unfettered opportunity to rebut anything in the record thought persuasive to the district court was afforded the class by the court. If procedural due process is the argument, under existing precedent, the class has been afforded more process than was due.

. In footnote 6 of his opinion for the court and his separate concurrence, Judge John R. Gibson faults my concern for the merits of this case. Although Judge Gibson’s formulation of the issue on appeal is slightly different than I have stated, ante at 724-25, we both agree that the correctness of Judge Whipple’s determination of the existence of unitary status in KCMSD is a component of the question at hand. It is my position that if KCMSD has reached unitary status, Judge Whipple should be affirmed. Thus, the merits of the unitary status holding must be reviewed, and the entire record, not just that developed on November 1 and 2, 1999, must be considered.
In spite of his panel opinion position that he continues to restate in substantial part en banc, Judge Gibson now purports to hinge reversal of Judge Whipple on his failure to schedule and hold a hearing on the subject of unitary status. He cites United States v. Board of School Commissioners, 128 F.3d 507 (7th Cir.1997), an inapposite case that actually cuts in the opposite direction, for the proposition that the class was deprived of a "constitutional guarantee” of a unitary status hearing. Ante at 726. This deprivation, he posits, requires a reversal and remand. Other than Board of School Commissioners, which unremarkably holds that you cannot impose more (rather than less as Judge Whipple proposes) requirements on a school district without notice and a hearing, Judge Gibson cites no authority for this newly minted constitutional guarantee. 128 F.3d at 512. I believe there is no such guarantee whether based upon due process, equal protection or any other constitutional provision. Under the procedures followed, the class was clearly afforded more due process than any apposite precedent has ever required.
Judge Gibson also argues that the merits of Judge Clark's 1997 decision, finding a purported vestige of prior discrimination wrapped up in an achievement gap, are beyond consideration by the court en banc. This argument is apparently based upon a "law of the case” theory. Again, he cites no precedent for this proposition and indeed, the argument turns law of the case principles upside down. This is especially true when the court en banc is considering, as here, a previously unreviewed panel opinion for the first time. See Irving v. United States, 162 F.3d 154, 161 (1st Cir.1998). And, as Judge Gibson himself stated in Liddell "the court en banc should attempt to decide the case correctly rather than consistently.” 731 F.2d at 1331.
In 1997, Judge Clark and the panel erroneously disregarded Supreme Court directions concerning burdens of proof and other substantive mandates. Beyond that, there was, as noted in Judge Loken's dissent, a total failure to establish a vestige of discrimination "traceable, in a proximate way, to [a] prior [constitutional] violation.” Freeman v. Pitts, 503 U.S. 467, 494, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992). There was simply nothing offered to Judge Clark beyond speculation and conjecture, and, as cataloged in the body of my dissent, every court that has been approached with this theory has rejected it out of hand.
Finally, Judge Gibson seems to misunderstand my concern that the panel's affirmance of Judge Clark's achievement gap vestige flies directly in the face of the Supreme Court's mandate in Jenkins III . My point is that not only does Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), omit student achievement as a factor for consideration for unitary status, Jenkins III specifically excludes this factor because it is controlled, as the Supreme Court noted, by circumstances wholly independent of unlawful discrimination. Jenkins III, 515 U.S. at 100-02, 115 S.Ct. 2038. Every other circuit asked to consider any manifestation of scholastic achievement as a vestige factor has agreed with this interpretation of Jenkins III and rejected the proposition. See United States v. City of Yonkers, 197 F.3d 41, 54-55 (2d Cir.1999); People Who Care v. Rockford Bd. of Educ., 111 F.3d 528, 537-38 (7th Cir.1997); Coalition to Save Our Children v. State Bd. of Educ., 90 F.3d 752, 776-77 (3d Cir.1996).

. The factors are student assignments, transportation, physical facilities, extracurricular activities, faculty assignments, and resource allocation.

. Additionally, it seems inconceivable that this court validated the district court’s finding that KCMSD was liable for a portion of an achievement gap that existed even before the children entered the school system. See Jenkins VIII, 959 F.Supp. at 1164-65. But, it did.

. The class, the court and Judges Heaney and Gibson in their concurrences concentrate solely upon the KCMSD educational programs purportedly developed and implemented (or in process of implementation) since Judge Clark's and the panel's adoption of an achievement gap vestige in 1997. However, the record available to Judge Whipple shows that the 1985 KCMSD remedial plan, formulated by Judge Clark and approved by the panel, was designed to achieve "results more in keeping with national norms,” with reading skills at such national norms to be achieved within four or five years, and was similar if not almost identical, with one exception, to the present set of plans touted by the class and insisted upon by the panel in its now vacated opinion. Jenkins v. Missouri, 639 F.Supp. 19, 24 (W.D.Mo.1985), aff'd in part, 807 F.2d 657 (8th Cir.1986) (en banc). That educational program included:
(a)An annual evaluation rating of AAA, the highest classification awarded by the Missouri State Department of Elementary and Secondary Education, for all KCMSD schools.
(b) Reduction of class sizes to levels below those required for the AAA rating.
(c) Extensive library improvements through improved media and library resources and through the hiring of at least twenty-two new librarians, thirteen of whom are certified for elementary schools.
(d) A system-wide computer education program with state-of-the-art automation equipment and highly skilled instructors.
(e) A reduced teaching load for all teachers and an improved curriculum with additional art, physical education and music programs with specialty teachers.
(f) Additional school counselors to begin service at the elementary level and to reduce the workload of existing counselors at the secondary level to one full time counselor for each 390 students or fraction thereof.
(g) A summer school program providing remedial and developmental learning experiences, reinforcement and enrichment instruction and a "desegregative learning experience.”
(h) A full day kindergarten program in all elementary schools in the district.
(i) An extended day program including before and after school tutoring.
*738 (j) An extensive early childhood development program.
[k] An "effective schools" program designed to accomplish changes in the KCMSD from the "bottom up.” This program involves money for special programs developed by staff, parents, patrons, administrators, principals, teachers and students.
[Q Staff development through special training in the principles and goals of the desegregation plan, implementation of effective instructional programs, effective information transmission, imposition of equitable discipline, solving transportation problems, use of school and community resources, and the law applicable to school desegregation.
Jenkins v. Missouri, 19 F.3d 393, 398 (8th Cir.1994) (Beam, J., dissenting to denial of petition for rehearing) (citations omitted).
The above-mentioned staff development plan mirrors the professional development plan and the classroom practices plan that are presently being pursued. The educational program and effective schools programs were focused on raising student test scores and making people accountable. The only current plan that does not appear to have something equivalent in the 1985 order is the assessment plan. That plan, however, is the one that all the parties now agree is fully implemented.
Although the current plans are now advanced as new and necessary for the educational progress needed to close the achievement gap in KCMSD, they really are, as philosopher Yogi Berra might have said, " deja vu all over again.” Although Jenkins III now indicates that this grandiose 1985 program was well beyond the remedial authority of the federal court, its establishment and vigorous implementation, at unparalleled cost to taxpayers, amply proves that KCMSD has now done everything "practicable” to achieve unitary status. Victory should be declared and the case should now be dismissed.

. There is also evidence that higher achieving students will respond better to these new techniques widening the gap even further. (Trent, Transcript at 1411-12).

. The court's opinion refers to "[t]he Jenkins class, representing the children of the Kansas City, Missouri School District.” Ante at 722. Under the evidence of this case, and the current vestige arguments being advanced by the class, it is, in my view, almost certain that the class does not now represent the interests of all of the children of KCMSD.

. It is true, as the court sets forth, that there were discussions of a January 3, 2000, hearing on July 19, 1999, August 24, 1999, and August 26, 1999.

. Since the court seems bent upon an alternate course, it is proper to make one additional observation. The court in its footnote 6 states that it finds it unnecessary to discuss the merits of Judge Whipple’s order concerning unitary status. Although not explicitly stated, this is presumably because the only issue reached by a majority of the court en banc is whether an evidentiary hearing should have been conducted by Judge Whipple prior to his decision, So, in my view, footnote 6, Chief Judge Wollman’s concurrence joined by Judge Morris Sheppard Arnold and this dissent should be a clear signal to Judge Whipple that he is now free to set a hearing date that accommodates a reasonable *741 preparation period for the parties and to then hear and decide the unitary status of KCMSD free and clear of any verbiage contained in the panel opinion which was vacated by the grant of en banc consideration in this case,